In re Barry Anthony TAYLOR as Receiver of Burns Philp Trustee Company (Canberra) Limited, Debtor.

Bankruptcy No. MI–94–00001–ER.

United States Bankruptcy Court,
C.D. California.

Jan. 20, 1995.

Paul S. Arrow, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, for plaintiff.

Leonard Chaitin, Law Offices of Yvonne Martinez, Van Nuys, CA, for defendant.

### MEMORANDUM OF DECISION

ERNEST M. ROBLES, Bankruptcy Judge.

On September 8, 1994, this court held a hearing on the petition of Barry Anthony Taylor as Receiver of Burns Philp Trustee Company (Canberra) Limited ("Receiver" or "Taylor") for relief under Bankruptcy Code section 304 ("304 Petition").[1] The Petition was timely controverted by Peter D. Clarke II ("Clarke") who, the Receiver alleges, has or controls assets purportedly belonging to Burns Philp Trustee Company (Canberra) Limited ("Burns Company" or "Company") within the United States. Declaration of Barry Anthony Taylor in Support of Emergency Motion for 1. Temporary Restraining Order and Order to Show Cause re Preliminary Injunction; and 2. Authorizing Production of Documents Pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Taylor Decl.") at ¶¶ 9–10.

On November 2, 1994, the court issued a brief order granting the 304 Petition. This memorandum constitutes the court's findings of fact and conclusions in law in support of such order.

## I. ISSUES PRESENTED FOR DECISION

The parties presented the following issues for determination at the hearing on the 304 Petition:[2]

1. Whether the Burns Company is the subject of a foreign proceeding as that term is defined in Section 101(23);

2. Whether the Receiver is a foreign representative of the Burns Company as that term is defined in Section 101(24); and

3. Whether the Court should exercise its discretion in granting the Receiver relief under Section 304.

## II. SUMMARY OF DECISION

■ The court finds that the Burns Company is the subject of a foreign proceeding, and that the Receiver is a foreign representative of the Burns Company, as such terms are defined in the Bankruptcy Code. Accordingly, the instant 304 Petition satisfies the requirements of Section 304(a).[3] The court further finds that where the requirements of Section 304(a) are satisfied, it has no discretion to dismiss the petition under Section 304(a).[4] The court accordingly grants the 304 Petition.

---

1. Section 304 states as follows: "(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative." 11 U.S.C. § 304(a). Unless otherwise indicated, all section references herein are to sections of 11 U.S.C. §§ 101–1330 (1978) (the "Bankruptcy Code").

2. The parties agreed upon the issues, which were submitted in a joint status conference statement.

3. *See* footnote 1, *supra*.

4. However, the Court notes that it does have significant discretion in considering the relief, if any, to grant under Section 304(b), and also in determining whether to abstain from the 304 Petition under Section 305. *See* section IV, *infra*. The court notes that the possibility of Section 305 abstention was not raised by either party.

## III. FACTUAL AND PROCEDURAL BACKGROUND [5]

### A. *The Australian proceedings.*

The Burns Company is an Australian corporation that managed and invested funds which it held on behalf of its clients. The Company currently has control of approximately $14 million in client funds. Taylor Decl. ¶2. As discussed in greater detail below, the Receiver is now in control of the Burns Company and is winding it up in accordance with Australian law. While under Clarke's control, the Burns Company's clients appointed it as the executor of wills, trustee of private trusts and as attorney-in-fact under powers of attorney. (Taylor Decl. ¶2.) Clarke is one of the present directors of the Burns Company as well as its former president. (Taylor Decl. ¶2).

On or about October 23, 1993, the Australian Securities Commission ("ASC") commenced an action in the Australian Supreme Court seeking appointment of a receiver and manager to take over the Burns Company's affairs (the "Receivership Action") alleging, *inter alia*, that the Burns Company and Clarke had used client funds for purposes not authorized by the relevant trust agreements. (Taylor Decl. ¶3.) On or about October 29, 1993, the ASC also filed a wind-up petition with the Australian Supreme Court. Declaration of Jonathan Peter Caddick in Support of Receiver's Reply Brief in Support of Petition Under Section 304 of the Bankruptcy Code ("Caddick Decl.") ¶2.

On December 1, 1993, the Australian Supreme Court issued an order appointing the Receiver as interim receiver and manager of the Burns Company's property (the "Receivership Order"). (Taylor Decl. ¶4; Ex. 1). The Receivership Order vested the Receiver with nearly complete control over the Burns Company. (Taylor Decl. ¶5.) The Receivership Order also provided the Receiver with all the powers specified in section 420(1) of the Australian Corporations Law (Australian Corporations Law, ch. 5, s. 420(1), Vol. 1, p. 472 (1992)) ("Section 420"). This section gives the Receiver the power to liquidate the Burns Company, initiate wind-up proceedings (which, as set forth above, had already been commenced by the ASC) and bring lawsuits on behalf of the Burns Company. (Taylor Decl. ¶7.)

On June 30, 1994, after the Receiver filed the instant 304 Petition in this court, the Australian Supreme Court granted the wind-up petition. (Caddick Decl. ¶5). The Receiver was appointed as liquidator of the Burns Company pursuant to the order granting the wind-up petition. (Caddick Decl. ¶4.)

### B. *The Burns Company/Aircraft Transactions.*

The Receiver, through his counsel, has stated his intention eventually to use the 304 Petition as a basis for seeking the turnover of certain Burns Company funds which, he asserts, were improperly transferred close to the time the ASC commenced the Receivership Action. However, the Receiver seeks no such relief at this time.[6]

The transaction currently under investigation by the Receiver involves the purchase of aircraft by the Burns Company. The Receiver alleges that certain transactions took place within the United States involving an improper transfer and use of Burns Company funds by Clarke or persons or entities under his control.

The Receiver asserts that in early 1993 the Burns Company entered into a contract with Aircraft Sales International, Inc. ("Seller") to purchase two Fairchild aircraft, serial numbers AC-543B ("Aircraft 543") and AC-651B ("Aircraft 651"), for $1.7 million each, which

---

5. Unless otherwise indicated, the facts contained herein are as alleged in the Taylor Declaration, or as they appear in the record of this case. The Receiver's investigation is on-going. Clarke lodged an objection to the Taylor Declaration based upon hearsay and further asserted that the Taylor Declaration was conclusory. However, Clarke did not object to the Taylor Declaration for purposes of the hearing on the preliminary injunction. *See* "Defendant Peter D. Clarke II's Opposition to Request for Injunctive Relief and Order Authorizing Production [of] Documents" at 9.

6. As set forth in greater detail below, on June 9, 1994 this Court granted the Receiver's motion for preliminary injunction (the "June 9 Order").

were then to be leased to a company in Argentina. (Taylor Decl. ¶ 9.) The Burns Company paid for Aircraft 543 in full. Burns Company and the Seller entered into a separate installment purchase agreement with respect to Aircraft 651, under which the Burns Company would pay $1.4 million of the purchase price in installments into an escrow account once the Seller made certain improvements to Aircraft 651. (Taylor Decl. ¶ 10.) The remainder of the purchase price of Aircraft 651 was to be paid upon delivery of the plane to the Burns Company. (Taylor Decl. ¶ 10(e).) The parties to the agreement appointed an attorney at an affiliate of Baker & McKenzie in Frankfurt, Germany, as the escrow agent. (Taylor Decl. ¶ 10(e).)

On September 9, 1993, the Burns Company transferred $1.4 million into a Baker & McKenzie trust account in Frankfurt. (Taylor Decl. ¶ 10(e).) However, the money did not stay in the escrow account. According to the Receiver, monies were transferred out of the escrow account by Doeser, Amereller, Noack, Rae Und Notare (allegedly Baker & McKenzie's affiliate in Frankfurt, Germany), to various bank accounts in the United States, including $1.35 million (the "Fund") to the Burns Company's account at First Interstate Bank of California in Los Angeles ("Bank"). (Taylor Decl. ¶ 10(i)). The Receiver believes that most or all of the Fund is no longer in the Burns Company's account at the Bank, having been transferred, by Clarke, at Clarke's direction, or by an individual related to Clarke, to various other individuals, banks, financial institutions, brokerage houses, and law firms within the United States. (Taylor Decl. ¶¶ 10(h)-(s).) However, the Receiver alleges that the Fund remains in Clarke's control. (Taylor Decl. ¶ 8.)

### C. *Proceedings before this court.*

Proceedings before this court ran concurrently with some of the proceedings before the Australian Supreme Court. On January 25, 1994 the Receiver filed the 304 Petition which Clarke answered on March 8, 1994. Clarke's answer contested the jurisdiction over his person and the rights in property that may be within the *in rem* jurisdiction of this court and sought dismissal of the 304 Petition.

On May 24, 1994, the Receiver filed and served his "Emergency Motion For: 1. Temporary Restraining Order and Order to Show Cause re Preliminary Injunction; and 2. Order Authorizing Production of Documents Pursuant to Federal Rule of Bankruptcy Procedure 2004; Memorandum of Points and Authorities and Declarations of Barry Anthony Taylor and Paul S. Arrow In Support Thereof" ("TRO Motion"). The TRO Motion sought, *inter alia*, to prohibit holders of certain property of the Burns Company, including property managed by the Burns Company or held by the Company in trust for others, from relinquishing, or disposing of it to anyone other than the Receiver.

A hearing on the Temporary Restraining Order was held on May 31, 1994. As a result of the hearing, and for those reasons as set forth by this court on the record at that hearing, the court granted the TRO Motion and entered its Temporary Restraining Order on May 31, 1994. A hearing on the Receiver's request for a preliminary injunction was also set for June 9, 1994.

At the June 9th hearing this court issued a preliminary injunction against Clarke and others, prohibiting such persons from relinquishing any property of the Burns Company in the United States, including property managed by the Burns Company or held by the Company in trust for others, to any persons other than the Receiver. The preliminary injunction remains in effect as of the date of this Memorandum of Decision.[7]

---

**7.** The June 9 Order provides, in part, that "[t]he Receiver has raised serious questions on the merits of the contentions that the Company is subject to foreign proceedings, that the Receiver is the foreign representative of the Company, and that the Funds, as that term is defined in the Motion, are property of the Company's estate and subject to turnover; 2. Unless a preliminary injunction is issued, the Funds may be relinquished to third parties or otherwise disposed of thereby interfering with and causing harm to the Receiver's efforts to administer the Company's estate subject to the foreign proceedings, and that as a result the Receiver, as representative of the Company, and the estate, will suffer immediate and

## IV. LEGAL DISCUSSION

█ Section 304(a) by its terms requires both a "foreign representative" and a "foreign proceeding." Clarke contests whether the Receivership Action constitutes a "foreign proceeding," arguing essentially that only an "insolvency proceeding" qualifies as such a foreign proceeding for purposes of the Bankruptcy Code.[8] In addition, Clarke argues that in any event this court cannot grant a 304 Petition without first determining that the Receivership Action is consistent with the due process considerations afforded in the United States. For the reasons set forth below, none of Clarke's arguments are availing.

### A. *The receivership action was a "foreign proceeding."*

█ Clarke argues that the Receivership Action is not a foreign proceeding for purposes of Sections 101(23) and 304(a). Clarke argues that a foreign proceeding must be an insolvency proceeding, and that an insolvency proceeding is necessarily a liquidation proceeding, citing *Goerg v. Parungo (In re Goerg),* 844 F.2d 1562 (11th Cir.1988), *cert. denied sub nom. Parungo v. Goerg,* 488 U.S. 1034, 109 S.Ct. 850, 102 L.Ed.2d 981 (1989). Clarke argues from this premise that since the Receiver purportedly admitted in a declaration that he might sell the Company as a going concern, there was no foreign proceeding.[9]

Clarke's premise is wrong. Section 101(23) clearly defines a "foreign proceeding" as a proceeding instituted "for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization." The court finds that, in this case, a "foreign proceeding" was commenced upon entry of the Receivership Order, which gave the Receiver authority to perform a broad variety of duties, including the actions specified in Section 101(23).[10]

The only case cited by Clarke in support of his interpretation of Section 101(23) is the *Goerg* case. The *Goerg* case, however, merely stands for the proposition that a Section 304 petition may be properly maintained "where the entity that is the subject of the foreign proceeding qualifies for insolvency administration under foreign law, but does not fall within the Bankruptcy Code's definition of 'debtor'." 844 F.2d at 1563. "[T]he debtor need only be properly subject, under applicable foreign law, to a proceeding commenced 'for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.'" 844 F.2d at 1568. Rather than supporting the narrow construction of Section 101(23) urged by Clarke, the *Goerg* case contemplates a relatively high degree of deference to foreign law.[11]

█ In a related point, Clarke argues that the existence of a wind-up proceeding separate from the Receivership proceeding

---

irreparable injury for which there is no adequate remedy at law."

8. Clarke does not contest that the Receiver is a "foreign representative," and the court finds that the Receiver is such a "foreign representative".

9. Clarke has consistently argued that the Receivership Action does not qualify as a "foreign proceeding" for purposes of Section 304. This firm position perhaps explains his failure to move for the court to abstain from the 304 petition under Section 305. Section 305 grants the court wide discretion on abstention issues, and expressly incorporates the factors specified in Section 304(c) as a possible basis for such abstention. *See* Section 305(a)(2)(B).

10. The Receivership Order, in specifying the duties of the Receiver, incorporates by reference Australian Corporations Law Section 420, which provides in relevant part:

Without limiting the generality of subsection (1) ... a receiver of property of a corporation has ... power:

   .     .     .     .     .

(g) to convert property of the corporation into money;
(h) to carry on any business of the corporation;

   .     .     .     .     .

11. Clarke alludes to a subsidiary argument that the Receiver was appointed to conduct a criminal investigation against Clarke on behalf of the ASC. There is nothing in the Receivership Order which provides support for this argument. In fact, the Receiver's duties are not unlike the traditional role of a chapter 7 trustee in the United States, who is often involved in an investigation of the activities of a debtor's principal in an attempt to locate and marshall assets for distribution to creditors.

shows that the Receivership Order did not create a foreign proceeding. It is not clear whether the wind-up proceeding could be considered in any relevant respect separate from the Receivership proceeding under Australian law.[12] In any event, such "separateness" is irrelevant, because both the Receivership Action and the wind-up proceeding qualify as foreign proceedings under Section 304. Clarke's argument rests again on the faulty premise that only a liquidation proceeding qualifies as a foreign proceeding for purposes of Section 304(a).

### B. The standards applicable to Section 304(c) are not relevant in determining whether a contested Section 304 Petition should be dismissed under Section 304(a).

■ Clarke essentially argues that despite the terms of Section 304(a)—which requires only the filing of a petition by a "foreign representative," and a "foreign proceeding," for the commencement of a proper Section 304 case—this court has discretion to dismiss the petition under Section 304 based on, among other things, the factors enumerated in Section 304(c). Clarke's argument defies the structure of the statute, and is unsupported by a proper reading of the relatively sparse body of Section 304 case law.

Section 304(c) enumerates certain factors which a court should consider in determining whether to grant relief under Section 304(b). Nowhere does Section 304(c) provide that in determining whether to grant a petition under Section 304(a), a court should look to such factors. Further, Section 304(a) does not cross-reference Section 304(c).

The relatively few published decisions involving Section 304(a), properly interpreted, do not support Clarke's position. Courts have tended to consider the issue of the commencement of the case under Section 304(a) simultaneously and in connection with the proper relief to be granted under Sections 304(b) and 304(c) only because in the typical fact pattern, the foreign representative virtually simultaneously files a Section 304 petition and seeks relief under Section 304(b). See, e.g., Koreag, Controle Et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341, 346 (2d Cir.1992) (Section 304 petition itself sought an injunction against attempts by a creditor to reach funds in an account maintained by the petitioner); Universal Casualty & Sur. Co. v. Gee (In re Gee), 53 B.R. 891, 894 (Bankr.S.D.N.Y.1985) (Section 304 petition itself sought various forms of relief including discovery, preliminary injunctions and requests for turnover, which the court granted); In re Culmer, 25 B.R. 621 (Bankr. S.D.N.Y.1982) (Section 304 petition itself sought to enjoin attaching creditors and others from further proceedings as well as the creation, perfection and enforcement of any lien, and for turnover of property).

As a result of the procedural posture of these and other cases, both the parties and the courts tend to mix issues regarding granting 304 petitions with issues more properly pertaining to the relief which the petitioners seek to obtain from the court under Section 304(b). See, e.g., In re Rubin, 160 B.R. 269, 274 (Bankr.S.D.N.Y.1993) (that " ... the factors in section 304(c) point to the propriety of granting an ancillary petition does not mean in and of itself that I am free to grant any conceivable type of relief."); and In re Petition of Brierley, 145 B.R. 151, 168 (Bankr.S.D.N.Y.1992) ("If I find that the factors contained in Section 304(c) militate in favor of granting an ancillary petition to best assure an economical and expeditions administration of the foreign estate, I may pursuant to section 304(b)(1) enjoin commencement or continuation of an action of an action against the foreign debtor ... .").[13]

---

12. By the time the hearing on the 304 Petition was held, the Australian Supreme Court had issued its wind-up order (the wind-up order was issued on or about June 30, 1994). However, the ASC had filed the wind-up action in October 1993 with notice to Clarke through his counsel in Australia. (Caddick Decl. ¶ 5).

13. Such "mixing" of the issues is not necessarily inappropriate. Where relief under Section 304(b) is to be denied, it may make little sense to grant the Section 304 petition. Here, as noted, the Receiver has already obtained a preliminary injunction. Therefore, the Court has at least reached a tentative conclusion that relief under Section 304(b) is appropriate. This was the same process undertaken by the court in *In re*

■ This case is different. The 304 Petition does not itself seek any relief. The Receiver obtained a preliminary injunction, and seeks no additional relief under Section 304(b) at this time. The only real issue before the court is whether the 304 Petition should be dismissed, not the propriety of any particular relief under Section 304(b). The 304 Petition should be dismissed if the Court finds that the Receivership Order does not create a foreign proceeding or that the Receiver is not a "foreign representative" for purposes of Section 304(a). *In re G.C.K. Tam,* 170 B.R. 838 (Bankr.S.D.N.Y.1994) (court did not consider the merits of the 304 petition where the court found that a foreign proceeding did not exist.) In *Tam,* the court stated that "[t]he statute is clear that 'for a 304 petition to be properly filed, there must be both a foreign proceeding to which the 304 case will be ancillary, and foreign representative who has filed the petition.'" 170 B.R. at 846 (quoting *In re Gee,* 53 B.R. at 897). This court agrees and finds that, in this case, both elements exist and the merits of any relief to be requested in connection with the 304 Petition need not be addressed at this juncture.

■ Clarke essentially argues that the court must rule on the propriety of relief under Sections 304(b) and (c) as part and parcel of making a determination on the propriety of the 304 Petition under Section 304. Specifically, Clarke argues that the Australian law under which the Receiver was appointed should not be afforded comity by this court under Section 304(c)(5). As noted above, this approach is inconsistent with the Code. Even the cases cited by Clarke do not support his argument. In *Cunard Steamship Co. v. Salen Reefer Services AB,* 773 F.2d 452 (2d Cir.1985) the issue was whether Section 304 was the exclusive remedy available to a representative of a foreign debtor. The court held that it was not. 773 F.2d at 456. The courts' discussion of comity in *Cunard* and in a case concerning the same Swedish bankruptcy proceeding, *Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709 (2d Cir.1987), was not within the context of whether to grant a Section 304 petition, but whether foreign law could be given effect by United States courts. 773 F.2d at 456; 825 F.2d at 713.

Clarke also cites the district court's decision in *Interpool, Ltd. v. Certain Freights of M/VS Venture Star,* 102 B.R. 373 (D.N.J. 1988) ("*Interpool I*"), *appeal dismissed, Interpool v. Certain Freights of M/VS Venture Star,* 878 F.2d 111 (3d Cir.1989) ("*Interpool II*") to provide support for his position. In that case a liquidator had been appointed under Australian law. Among the issues before the court were whether to dismiss a competing chapter 7 case and whether the liquidator's Section 304 petition should be granted. *Interpool I,* 102 B.R. at 375. In deciding whether to grant the 304 petition the *Interpool I* court stated that the outcome would depend on the factors enumerated in Section 304(c). 102 B.R. at 377. Among these factors, as noted above, is comity. The *Interpool I* court then determined that extending comity to a foreign court required that the foreign court abide by fundamental standards of procedural fairness. *Id.* That court held, for reasons irrelevant to our discussion, that comity could not be extended because Australian law did not meet such standards. 102 B.R. at 380. The *Interpool I* court granted the competing chapter 7 petition, and dismissed the Section 304 petition. *Id.*

■ On appeal, the Third Circuit, in *Interpool II,* clarified that the lower court was not deciding whether to grant the Section 304 petition, but rather the lower court was determining the relief sought in the 304 petition, *i.e.,* dismissal of the competing chapter 7 case. *Interpool II,* 878 F.2d 111, 113 (3d Cir.1989). Consequently, comity, a factor under Section 304(c) and which was properly before the court in *Interpool I* in determining whether to grant relief under Section 304, is not before this Court and need not be considered at this time.

■ Put simply, the Receiver asserts that once a court has determined that the 304 petition was filed by a foreign representative

*Lines,* 81 B.R. 267 (Bankr.S.D.N.Y.1988), wherein the Section 304 petitioners sought a preliminary injunction pending entry of an order granting relief under Section 304.

in a foreign proceeding, the court's inquiry is done and that the court essentially has no discretion to dismiss the 304 petition. Clarke argues that a court has much broader discretion when determining whether or not to dismiss a 304 petition, and that such discretion encompasses essentially a "mini-trial" on whether the foreign representative will be entitled to relief under Section 304(b).

The Receiver is correct. Although the court has a considerable amount of discretion when considering whether or not to grant relief under Section 304(b) (and the type of relief appropriate), and also whether or not to abstain under Section 305, the statutory framework does not contemplate judicial discretion under Section 304(a) alone.

## V. CONCLUSION

Based upon the foregoing, the instant 304 Petition is granted.