In re Lee Anthony **MANNING** and Gary Peter **Squires, as Joint Administrators of Fitmay Produce Limited, Debtor in Foreign Proceedings.**

**A.P. Esteve Sales, Inc., Appellant,**

v.

**Lee Anthony Manning and Gary Peter Squires, as Joint Administrators of Fitmay Produce Limited, Appellee.**

**BAP No. EC–98–1664–RyJR.**

**Bankruptcy No. 98–21482–C.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 14, 1999.

Decided July 1, 1999.

Marvin D. Mohn, Chadbourne & Parke, Los Angeles, CA, for Lee Anthony Manning and Gary Peter Squires.

Before RYAN, JONES, and RUSSELL, Bankruptcy Judges.

## OPINION

RYAN, Bankruptcy Judge.

After Fitmay Produce Limited ("Debtor") filed an insolvency petition in the United Kingdom, creditor A.P. Esteve Sales, Inc. ("Esteve") filed an action against Debtor in San Joaquin County Superior Court (the "State Court"), seeking damages resulting from Debtor's breach of various almond contracts. Lee Anthony Manning and Peter Squires, joint administrators in Debtor's insolvency proceeding (the "Administrators"), filed a petition pursuant to § 304,[1] seeking a temporary restraining order (the "TRO") and preliminary injunction to stay the State Court proceedings. The bankruptcy court issued the TRO and an order to show cause regarding whether to impose a preliminary injunction. Trial was subsequently held, and the bankruptcy court imposed a permanent injunction, prohibiting Esteve and other California creditors from commencing or continuing any action or legal proceeding against Debtor or its property in the United States, or from enforcing any judgment, assessment, or order to create, perfect, or enforce any lien, set-off, or other claim against Debtor or its property in the United States.

Esteve filed a timely notice of appeal.

We AFFIRM.

## I. FACTS

The facts are undisputed. Debtor is a company incorporated under the laws of the United Kingdom and imports and exports a variety of food products including

Thomas R. Phinney, Weintraub, Genshlea & Sproul, Sacramento, CA, for A.P. Esteve Sales, Inc.

1. Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

hazelnuts, almonds, apricot kernels, and dried fruits. Esteve is a California corporation that grows nuts, fruits, and vegetables in the Central California Valley and markets its produce worldwide.

From August 1996 through September 1997, Debtor entered into fourteen contracts with Esteve to purchase almonds. Esteve delivered the almonds pursuant to the contracts, but Debtor failed to accept delivery or pay for the almonds. Esteve resold the almonds at a loss of $219,400 plus dock fees of $14,000. In November 1997, Esteve requested payment of contract damages. However, Debtor failed to pay.

On December 2, 1997, Esteve obtained a Belgium court (the "Belgium Court") order authorizing Esteve to "arrest" (attach) two container-loads of Debtor's almonds located in Antwerp, Belgium. In March 1998, the almonds subject to attachment were sold, and the proceeds in the approximate sum of $280,200 were placed in the custody of the Belgium Court.

On December 8, 1997, Esteve filed the State Court action seeking the balance of damages resulting from Debtor's breach of contract.

On December 19, 1997, Debtor filed an insolvency petition in the High Court of Justice, Chancery Division, Companies Court (the "British Court") along with an affidavit to obtain an administrative order from the British Court. On the same day, the British Court issued an order appointing the Administrators to manage Debtor's business and authorizing them to seek approval for a "voluntary arrangement" as provided for under Part I of the Insolvency Act of 1986.

On January 6, 1998, the Administrators requested that the Belgium Court lift the attachment of the almonds in Antwerp, Belgium. On May 7, 1998, the Belgium Court issued an order denying the request. The court found that the United Kingdom and Belgium did not have reciprocity in connection with their respective insolvency proceedings, that the British insolvency proceeding did not have an extra-territorial effect in Belgium, that the British Court did not recognize the equality of distribution among domestic and foreign creditors, and that the Belgium "arrest" procedure provided for claims of other creditors "and in no sense [would] endanger the equality amongst the creditors, but will on the contrary conserve for the creditors the proceeds of the sale." Translation of J. by the Judge of Arrests, 1st Chamber, Case No. 98–174–A (May 27, 1998). The Administrators appealed this order.

On February 2, 1998, the Administrators filed a petition in the bankruptcy court pursuant to § 304, seeking the TRO and a preliminary injunction to stay the State Court proceedings and any other actions domestic creditors might initiate.

On February 11, 1998, the bankruptcy court issued the TRO and an order to show cause why a permanent injunction should not be imposed. In August 1998, trial was held on the permanent injunction. Because the parties stipulated to all of the essential facts, no witnesses testified. At the conclusion of trial, the court granted the Administrators' request for a permanent injunction.

On September 18, 1998, the bankruptcy court entered an order (the "Order") granting the § 304 petition and the permanent injunction. Specifically, the court enjoined Esteve and other persons and entities from commencing or continuing any action or other legal proceeding against Debtor or its property located in the United States and from enforcing any lien, setoff, or other claim against Debtor or its property in the United States. The court also ordered that if the stay imposed under the Insolvency Act of the United Kingdom should be modified or lifted in a manner that would allow the British creditors to commence or continue actions against Debtor, Debtor's creditors would be per-

mitted to commence or continue actions in the United States to the same extent.[2]

On September 18, 1998, Esteve timely filed a notice of appeal of the Order.

## II. ISSUES

A. Whether the bankruptcy court had subject-matter jurisdiction to grant the injunction pursuant to § 304(b)(1) when Debtor did not have any property in the United States.

B. Whether the bankruptcy court abused its discretion in granting the injunction pursuant to § 304(b)(1).

## III. STANDARD OF REVIEW

■ "The existence of subject matter jurisdiction is a question of law reviewed de novo." *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 779 (9th Cir.1991).

■ We review the bankruptcy court's decision under § 304 to enjoin actions and the enforcement of judgments against debtors involved in foreign bankruptcy proceedings or their property for an abuse of discretion. *See In re Petition of Singer*, 205 B.R. 355, 356 (S.D.N.Y.1997); *see also*

*Cunard Steamship Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459 (2d Cir.1985) (" 'In exercising its discretion the district court is to guard against forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality.' ") (quoting *Banque de Financement, S.A. v. First Nat'l Bank of Boston*, 568 F.2d 911, 921 (2d Cir.1977)); *cf. Remington Rand Corporation–Delaware v. Business Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir.1987) ("Because the extension or denial of comity is discretionary, we review this issue by the abuse of discretion standard.").

## IV. DISCUSSION

A. *The Bankruptcy Court Had Subject–Matter Jurisdiction to Enjoin Actions Against Debtor Even Though Debtor Did Not Have Assets in the United States.*

■ Esteve argues for the first time on appeal in his reply brief that the bankruptcy court erred when it ordered an injunction under § 304(b)(1)[3] because the almond proceeds at issue are not located in

**2.** At oral argument on appeal, both parties conceded that they understood that the scope of the injunction did not preclude Esteve or other creditors from bringing actions against Debtor or Debtor's property outside of the United States. Thus, for example, Esteve was not precluded by the bankruptcy court from obtaining a judgment against Debtor in the United Kingdom, Belgium, France, or any country other than the United States.

**3.** Section 304 provides in pertinent part:

§ 304. **Cases ancillary to foreign proceedings.**
(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
(1) enjoin the commencement of continuation of—
(A) any action against—

(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or
. . . .
(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
(1) just treatment of all holders of claims against or interests in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.
11 U.S.C. § 304.

the United States, but rather, are being held for distribution in Belgium. *See* Appellant's Reply Br. at 4–5. This argument challenges the bankruptcy court's jurisdiction to enjoin actions against a debtor involved in a foreign insolvency proceeding when the activity being enjoined involves property that is not located in the United States. Although issues not raised and argued in the opening brief are ordinarily deemed to have been waived, *see United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir.), *cert. denied*, 516 U.S. 814, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995), jurisdictional issues may be raised at any stage of the litigation. *See National Organization For Women, Inc. v. Scheidler*, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

Although nearly all of the cases in which bankruptcy courts have taken jurisdiction of a § 304 petition involve the presence of the foreign debtor's property in the United States, *see Haarhuis v. Kunnan Enters., Ltd.*, 223 B.R. 252, 254 (D.D.C.1998), "[n]owhere does the legislative history suggest that the presence of debtor-owned property in the United States which might be vulnerable to domestic process was a sine qua non of bankruptcy court jurisdiction under § 304." *Id.* at 255. In *Haarhuis*, the district court held that "a § 304 petition is not to be considered solely as a proceeding in the nature of an application for in rem or quasi-in-rem relief and affecting only property in the United States." *Id.* Rather, the court affirmed the bankruptcy court's order enjoining a breach of contract action under § 304 even though no domestic assets were involved. *Id.*

█ This holding is in accordance with the plain language of 304(b)(1)(A)(i) which states that a court may enjoin the commencement or continuation of any action against "a debtor with respect to property involved in such foreign proceeding." 11 U.S.C. § 304(b)(1)(A)(i). The statute does not limit this power of the bankruptcy court to situations where the debtor has property located in the United States. "In

interpreting a statute, we 'look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. Then, if the language of the statute is unclear, we look to its legislative history.'" *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 830–31 (9th Cir.1996) (quoting *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir.1994)).

The language of the statute here is not unclear in light of its objective and the policy supporting that objective. Clearly, Congress wanted the bankruptcy courts of the United States, subject to certain guidelines, to recognize the primary interests of a foreign proceeding to administer property involved in that proceeding. This policy of comity for foreign proceedings is not dependent on property of the foreign debtor existing in the United States. Congress certainly had the power to authorize bankruptcy courts to enjoin actions within the United States that effectively undercut this policy whether or not property of the foreign debtor is located in the United States. Accordingly, we conclude that a bankruptcy court has subject-matter jurisdiction to enjoin an action against a foreign debtor with respect to property involved in the foreign proceeding even if the property is located outside of the United States.

B. *The Bankruptcy Court Did Not Abuse Its Discretion in Granting the Administrators' Request for the Imposition of the Injunction Under § 304(b)(1).*

The bankruptcy court granted the Administrators' request for the imposition of the injunction under § 304(b)(1) after determining that (1) the creditors in the United Kingdom are subject to a stay that is available under the laws of the United Kingdom, (2) the basic bankruptcy distribution scheme in the United Kingdom is fundamentally similar to the distribution scheme under the Bankruptcy Code (the "Code"), (3) Belgium law apparently con-

templates that before anything is released to creditors, notice is given to let others establish their claims, and (4) if the matter were allowed to proceed to judgment in the State Court, it could lead to a situation where Esteve would receive a greater proportional distribution than other creditors in the United Kingdom.

Esteve argues that the bankruptcy court erred in enjoining it from proceeding against the almond proceeds because the Belgium Court determined that the proceeds should be distributed in a separate Belgium proceeding rather than in the British insolvency proceeding. Specifically, Esteve argues that the injunction was improper because the almond proceeds are no longer "involved" in the Debtor's insolvency case, Debtor's insolvency has no extra-territorial effect in Belgium, the almond seizure is not preferential and creates no lien, and the bankruptcy court should have fashioned a less restrictive remedy. We disagree.

 The Code "provides for a flexible approach to international insolvencies dependent upon the circumstances of the . . . case. If any philosophy can be attributed to the structure of the Code it is that of deference to the country where the primary insolvency proceeding is located . . . and flexible cooperation in administration of assets." *Hong Kong and Shanghai Banking Corp. v. Simon (In re Simon),* 153 F.3d 991, 998 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999). Section 304 does not govern full-fledged bankruptcy cases, "but rather[, governs] limited proceedings 'designed to operate in aid of a principal proceeding abroad.'" *Interpool, Ltd. v. Certain Freights of the M/VS Venture Star,* 878 F.2d 111, 112 (3d Cir.1989) (quoting 2 L. KING, COLLIER ON BANKRUPTCY ¶ 304.01, at 304–8 (15th ed.1988)). It is "aimed at administering assets located in the United States, *preventing piecemeal distribution of assets of the foreign debtor as a result of legal proceedings initiated in domestic courts by local creditors,*

and/or obtaining other appropriate relief." 2 L. KING, COLLIER ON BANKRUPTCY ¶ 304.03[1] (15th ed. rev.1998) (emphasis added); *see also Armco Inc. v. North Atl. Ins. Co. (In re Bird),* 229 B.R. 90, 94 (Bankr.S.D.N.Y.1999). In determining whether to enjoin the continuation or commencement of any action against a foreign debtor or against property involved in a foreign proceeding, the court must consider " 'what will best assure the economical and expeditious administration of [the] estate,'" consistent with the criteria enumerated in § 304(b)(1), (c). *Interpool,* 878 F.2d at 112–13 (quoting 11 U.S.C. § 304(c)). Section 304 "expresses Congressional recognition of an American policy favoring comity for foreign bankruptcy proceedings." *Remington Rand,* 830 F.2d at 1271.

 Here, Esteve's assertion that the permanent injunction was improper because the Belgium Court "carve[d] out the almond proceeds from the assets that are property of or involved in the English bankruptcy proceeding," Appellant's Opening Br. 5, is without merit. Unlike § 304(b)(2), which requires the bankruptcy court to make a determination of the debtor's interest in property before allowing turnover of the property to a foreign representative, *see Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 349–50 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992), § 304(b)(1) permits the court to enjoin the commencement or continuation of an action against a debtor with respect to property "involved" in such proceeding or such property. *See* 11 U.S.C. § 304(b)(1). A proceeding to enjoin commencement or continuation of an action against the foreign debtor does not require the bankruptcy court to make a determination of the debtor's property interests. *See In re Brierley,* 145 B.R. 151, 168 (Bankr.S.D.N.Y.1992). Here, although the Belgium Court denied the Administrators' motion to lift the attachment on the al-

mond proceeds because it was concerned that British creditors may receive preferential treatment over foreign creditors in the British insolvency proceeding, it did not make a determination that the almond proceeds were not "involved" in the British insolvency proceeding. On the contrary, the court implicitly recognized that the proceeds were involved in the British insolvency proceeding but decided to uphold the attachment to protect foreign creditors. The court noted that the attachment was temporary and allowed for "equality amongst the creditors." Thus, Esteve's assertion that the Belgium ruling effectively withdrew the almond proceeds from the jurisdiction of the British Court is irrelevant for purposes of the bankruptcy court's imposition of an injunction under § 304(b)(1). Clearly, the almond proceeds are "involved" in the British insolvency proceeding.

■ In addition, the ultimate disposition of the almond proceeds is irrelevant for purposes of determining the propriety of the injunction. Although the almond proceeds are located in Belgium, the injunction enjoins Esteve and other California creditors from continuing or commencing an action in California *against Debtor or Debtor's property located in the United States.* The injunction provides in pertinent part:

> Esteve and other persons and entities set forth on Exhibit "A" annexed hereto (the "California Parties") *are permanently enjoined from commencing or continuing any action or other legal proceeding* (including, without limitation, arbitration, or any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever)

*against the Company or its property in the United States.*

Order Granting Section 304 Pet. and Permanent Inj. (Aug. 12, 1998) at 2 (emphasis added). Because the almond proceeds are not located in the United States, the injunction is directed primarily at enjoining actions against Debtor rather than its property. Indeed, the Administrators filed the § 304 petition to stay the continuation of the State Court action and to prevent Esteve or other California creditors from obtaining judgments that would allow judgment creditors to execute on the attachment of the almond proceeds. Section 304(b)(1) gives bankruptcy courts broad authority to issue an injunction " 'to prevent individual American creditors from arrogating to themselves property belonging to the creditors as a group.' " 2 L. KING, COLLIER ON BANKRUPTCY ¶ 304.05 (quoting *In re Banco Nacional de Obras y Servicios Publicos, S.N.C.,* 91 B.R. 661, 664 (Bankr.S.D.N.Y.1988)). Thus, because § 304(b)(1) is designed "to enable all claims against a foreign debtor to be handled in the same forum, if the foreign forum meets certain criteria," *Haarhuis,* 223 B.R. at 254, the bankruptcy court's imposition of the injunction is appropriate if the criteria enumerated under § 304(c) weigh in favor of deferring to the foreign insolvency proceeding.[4]

1. *The § 304(c) Factors Favor the Imposition of an Injunction.*

■ In determining whether to enjoin creditors under § 304(b)(1), bankruptcy courts "shall be guided by what will best assure an economical and expeditious administration of [the foreign bankruptcy] estate." 11 U.S.C. § 304(c). The Code lists the following six factors that the court should consider in making a determination

---

4. Although the determination of whether to grant an ancillary petition under § 304(a) and whether to impose an injunction under § 304(b) are two distinct issues, *see In re Taylor,* 176 B.R. 903, 908–09 & n. 13 (Bankr. C.D.Cal.1995), "[s]uch 'mixing' of the issues is not necessarily inappropriate," where, as here, the petitioners sought a preliminary in-

junction pending entry of an order granting relief under § 304(a). *Id.* at n. 13.

Here, because Esteve does not challenge the propriety of the ancillary petition on appeal, but rather, challenges the propriety of the injunction under § 304(b)(1), we only address the latter issue.

under § 304(b): (1) just treatment of all holders of claims against or interests in such estate; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of such estate; (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; (5) comity; and (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns. *Id.* The legislative history indicates that these factors are

> guidelines ... designed to give the court maximum flexibility in handling ancillary cases. Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.

H.R.Rep. No. 95–595, at 324–25 (1977); S.Rep. No. 95–989, at 35 (1978).

### a. *Just Treatment of All Holders of Claims.*

 Section 304 is designed to ensure centralization of claims administration in the foreign forum, which is essential to the successful resolution of the foreign insolvency proceedings. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo, A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987). "The very purpose of the § 304 proceeding is to extend the English automatic stay to American creditors and assets and not allow creditors to do here what they would not be allowed to do in the United Kingdom." *Bird,* 229 B.R. at 94 (citing *Lindner Fund, Inc. v. Polly Peck Int'l PLC,* 143 B.R. 807 (S.D.N.Y.1992)).

At the conclusion of the trial, the court considered Esteve's claim that the United States creditors could be at a disadvantage against creditors not bound by the stay in the British insolvency proceeding (i.e.,

creditors in some third country that is not the United States or the United Kingdom). The court found that this unsubstantiated prejudice was outweighed by the possibility that Esteve would receive a greater proportional distribution than the creditors in the United Kingdom if the State Court action was allowed to proceed to judgment and the judgment was enforced in Belgium. Accordingly, the court held that it was appropriate to leave "the matter fundamentally in control of proceeding in the United Kingdom" by granting the permanent injunction. Reporter's Tr. of Proceedings, Mot. for T.R.O. before the Honorable Christopher Klein, Judge (Aug. 12, 1998) at 18.

Esteve asserts that the Belgium Court determined that, based on prior experience, the English Administrators may prefer domestic creditors over foreign creditors. Although the Belgium Court did make this determination, the bankruptcy court correctly found that the distribution schemes in the United Kingdom and the United States are fundamentally similar. *See, e.g., In re Singer,* 205 B.R. 355, 357 (S.D.N.Y.1997) (citing the bankruptcy court's finding that "the English bankruptcy system is 'reasonably alike' the American system"); *Daniels v. Powell,* 604 F.Supp. 689, 695 (N.D.Ill.1985) ("Under Bermuda law [a common law country], no preference is given to the claims of Bermuda citizens."); *Brierley,* 145 B.R. at 164–66 (providing a thorough comparison of the relevant provisions of the Code and the Insolvency Act, and concluding that the Insolvency Act is not repugnant to American laws and policies); *In re Gercke,* 122 B.R. 621, 629 (Bankr.D.C.1991) ("The procedures of the United Kingdom Insolvency Act are comparable to the procedures of our Bankruptcy Code.").

Also, the bankruptcy court provided for the automatic lifting or modification of the injunction if the British Court lifted or modified the stay imposed under the Insolvency Act to permit British creditors to

commence or continue actions against Debtor or Debtor's property.

Thus, the injunction imposed by the bankruptcy court was consistent with the just treatment of all claimholders including Esteve. An injunction is appropriate "when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum." 2 L. KING, COLLIER ON BANKRUPTCY ¶ 304.05. Had Esteve been permitted to proceed to judgment, it could have improved its position vis-à-vis other unsecured creditors, thereby potentially disrupting the orderly reconciliation of claims and the fair distribution of assets in the British insolvency proceeding. *See, e.g., Gercke,* 122 B.R. at 626 (stating that "there may be cases in which it is appropriate to enjoin a mere action to reduce a claim to judgment in order to 'assure an economical and expeditious administration of [t]he estate' ") (citation omitted).

Accordingly, the bankruptcy court properly determined that the imposition of the injunction was consistent with the just treatment of all claimholders.

b. *Protection of Claimholders in the United States Against Prejudice and Inconvenience in the Processing of Claims in the Foreign Proceeding.*

As stated supra, the bankruptcy court considered whether the United States claimholders would be prejudiced or inconvenienced by processing their claims in the British insolvency proceeding and concluded that British insolvency law was fundamentally similar to the distribution scheme under the Code. However, as a precaution, the bankruptcy court ordered that the injunction would be lifted or modified to the extent that the British Court lifted or modified the stay imposed under the Insol-

vency Act to permit British creditors to commence or continue actions against Debtor or Debtor's property.

In addition, in response to Esteve's argument that Esteve could be prejudiced vis-à-vis claimholders from third countries not bound by the stay imposed under the Insolvency Act or the permanent injunction imposed under § 304(b)(1), the bankruptcy court found that "Belgium law ... contemplate[s] that before anything is handed out, notice is given to let others establish their claims." Reporter's Tr. of Proceedings, Mot. for T.R.O. before the Honorable Christopher Klein, Judge (Aug. 12, 1998) at 17. Esteve does not challenge this finding. Thus, presumably, claimholders in the United Kingdom and the United States would have the opportunity to protect their interest if a claimholder from a third country attempted to recover on its claim from the almond proceeds.[5] As one bankruptcy court aptly stated:

"[i]t is doubtful that under § 304 Congress expected a foreign bankruptcy proceeding to be less prejudicial and inconvenient than a United States bankruptcy case before injunctive relief would be granted." [*Gercke*], 122 B.R. at 621, 629. [The creditor] does not posit any particularized harm which will befall it if forced to litigate abroad. Moreover, we unhesitatingly require foreign creditors to litigate in our courts if they wish a distribution from a U.S. debtor's estate. It is thus difficult to label as so prejudicial and inconvenient to U.S. creditors as to warrant denial of injunctive relief that which we require of foreign creditors in our own cases. Finally, our courts have not shrunk from vacating attachments, when necessary, and sending the U.S. creditors to the foreign court to litigate their claims in a

---

5. Esteve does not challenge the bankruptcy court's understanding of Belgium law or demonstrate any actual prejudice suffered by the imposition of the injunction. Indeed, as the *Belgium Court* specifically stated: "a conservatory arrest is a temporary measure and cannot cause any damages to the matter itself,

and in no sense will endanger the equality amongst the creditors, but on the contrary will conserve for the creditors the proceeds of the sale of, in this case, perishable goods." *Translation of J. by the Judge of Arrests, 1st Chamber, Case No.* 98–174–A (May 27, 1998) at 5.

single forum along with other creditors so long as the claims processing procedure is fundamentally fair.

*Brierley,* 145 B.R. at 163 (alteration in original) (citations omitted).

Consequently, the bankruptcy court properly considered the potential prejudice to United States claimholders and crafted the injunction in a manner that provided protection to those claimholders in the event that the British Court lifted or modified the stay.

c. *Prevention of Preferential or Fraudulent Disposition of Property of the Insolvency Estate.*

Contrary to the Belgium Court's ruling, there is no indication that British creditors will receive a preference over the disposition of property vis-a-vis foreign creditors. First, the Insolvency Act is fundamentally similar to the Code. *See Singer,* 205 B.R. at 357; *Daniels,* 604 F.Supp. at 695; *Brierley,* 145 B.R. at 164–66; *Gercke,* 122 B.R. at 629. In addition, the bankruptcy court tailored the permanent injunction in such a manner as to put British and California creditors on an equal footing in the event that the British Court lifted or modified the stay. Finally, as indicated by the Belgium Court, the attachment of the almond proceeds will facilitate "equality amongst the creditors." There is simply no evidence that the Belgium Court will prefer creditors who are not bound by the permanent injunction in California or by the British Court's stay. Consequently, it is unlikely that the almond proceeds will be disposed of in a preferential or fraudulent manner.

d. *Distribution of Estate Proceeds Substantially in Accordance with the Order Prescribed by this Title.*

Again, there is no indication that the proceeds of the Debtor's estate will be distributed in a manner that is substantially inconsistent with the Code. "[S]ection 304(c)(4) does not command that the distributive scheme wholly replicate ours. What it directs the court to consider is whether that scheme is 'substantially in accordance' with that which we employ." *Brierley,* 145 B.R. at 167 (footnote omitted). A number of cases recognize that the British Insolvency Act and the Code are fundamentally similar. *See Singer,* 205 B.R. at 357; *Daniels,* 604 F.Supp. at 695; *Gercke,* 122 B.R. at 629; *Brierley,* 145 B.R. at 164–66 (undertaking a detailed analysis of the British insolvency statutes and finding them substantially similar to the Code); *cf. Universal Cas. & Sur. Co. v. Gee (In re Gee),* 53 B.R. 891, 902 (Bankr. S.D.N.Y.1985) (recognizing that the Companies Law, which is derived from the British Companies Act and governs insolvency proceedings in the Cayman Islands, is similar to the Code).[6]

Consequently, this factor supports the imposition of an injunction under § 304(b)(1).

e. *Comity.*

The Supreme Court has defined comity as

neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163–66, 16 S.Ct. 139, 40 L.Ed. 95 (1895). "International comity in transnational insolvency

---

6. For example, the automatic stay under § 11 of the Insolvency Act is "generally coextensive with ours under Code § 362 except that it applies to both pre- and postpetition claims alike," "[t]he Insolvency Act provides a comprehensive procedure for the orderly and equitable distribution of a debtor's assets among all of its creditors," "[g]eneral unsecured creditors are treated pari passu under section 107 [of the Insolvency Act]," and "[s]ecured creditors are paid the value of their security and, to the extent they are not fully paid, they share pari passu with general unsecured claims." *Brierley,* 145 B.R. at 164–66.

proceedings must be considered in the context of bankruptcy theory." *Simon,* 153 F.3d at 998. Although most courts support either the "territorial"[7] or "universalist"[8] theory of international bankruptcy law, the Ninth Circuit has held that the Code does not codify either theory. *See Simon,* 153 F.3d at 998. Rather, the Ninth Circuit has stated that "[i]f any philosophy can be attributed to the structure of the Code it is that of *deference to the country where the primary insolvency proceeding is located,* including the United States if the plenary proceeding is located here, *and flexible cooperation in administration of assets." Id.* at 998 (emphasis added).

While neither § 304(c) nor its legislative history allocates the weight to be given to these six factors, many courts view comity as the most significant factor because the other factors (aside from the fresh start element) "are inherently taken into account when considering comity." *Koreag,* 130 B.R. at 712; *see also In re Culmer, G.A.D.,* 25 B.R. 621, 633–34 (Bankr. S.D.N.Y.1982); *Gee,* 53 B.R. at 901 ("Although comity is only one of six factors to be considered in determining whether to grant relief, it often will be the most significant, as here, where it serves as the crux of debtor's argument."); *but see In re Papeleras Reunidas, S.A.,* 92 B.R. 584, 594 (Bankr.E.D.N.Y.1988) (refusing to follow cases affording comity greater weight than the other five factors).

▮▮▮▮▮ "[U]nder general principles of comity as well as the specific provisions of section 304, federal courts will recognize

foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat the claims of local creditors." *Victrix S.S. Co.,* 825 F.2d at 714. Deferring to a foreign bankruptcy case is appropriate when the foreign law is not "repugnant to American laws and policies." *In re Davis,* 191 B.R. 577, 587 (Bankr. S.D.N.Y.1996) (citing *Brierley,* 145 B.R. at 166; *Gee,* 53 B.R. at 904); *see also Cunard,* 773 F.2d at 459 (stating that the court should protect American creditors from having to participate in foreign proceedings where their claims will receive unfair treatment).

Here, the bankruptcy court granted comity in favor of the British insolvency proceeding because the British insolvency laws are fundamentally similar to the Code. Therefore, American creditors should receive fair treatment under British law. This determination was not erroneous. Esteve has not demonstrated any basis for a finding that it will likely be treated unfairly in the British insolvency proceeding. Because the British Insolvency Act is not "repugnant to American laws and policies," *Brierley,* 145 B.R. at 166, and Esteve will likely receive fair and equal treatment under English law, the bankruptcy court did not err in granting comity to the British insolvency proceeding.[9]

2. *The Injunction Is Not Improper or Overly Broad.*

Esteve argues that the injunction was not authorized under § 304(b)(1)(A)(i) for the following reasons: (1) the issuance of

---

7. The territorial approach favors domestic creditors by "administering the insolvent firm's assets located within its borders according to its own laws without any regard to the firm's assets located elsewhere." Robert K. Rasmussen, *A New Approach to Transnational Insolvencies,* 19 MICH.J. INT'L L. 1, 16 (Fall 1997) (noting that academics have largely embraced the universalist approach).

8. The universalist philosophy "contemplates one plenary transnational proceeding completely governing the administration of assets world-wide." *Simon,* 153 F.3d at 998; *see*

*also* Tandi Armstrong Panuska, Comment, *The Chaos of International Insolvency— Achieving Reciprocal Universality Under Section 304 or MIICA,* 6 TRANSNAT'L LAW. 373, 385 & n. 97 (Spring 1993) (and cases cited therein) (noting a distinct trend among courts towards increased recognition of the universality approach).

9. We need not address § 304(c)(6) because the insolvency proceeding does not involve the situation where an individual is seeking a fresh start.

the injunction is not necessary to help Debtor manage and preserve its assets because Debtor's insolvency case is a "straight liquidation" case, and thus, there is no activity to disrupt; (2) the bankruptcy court should have fashioned a less-restrictive remedy "that permits the creditors to share in a distribution of the almond proceeds"; and (3) the court should have extended comity to the Belgium Court's determination of its jurisdiction over the almond proceeds.

Although this case involves the liquidation of Debtor rather than reorganization, we disagree with Esteve's argument that allowing Esteve to proceed with the litigation will not disrupt the British insolvency proceeding. As stated supra, permitting Esteve to obtain a judgment lien on the almond proceeds would likely give Esteve an advantage over other unsecured creditors who are bound by the British Court's stay.

In addition, while we agree with Esteve that § 304(b)(1) provides a flexible approach to international insolvencies, we do not believe that the imposition of the injunction was an abuse of discretion. The bankruptcy court accepted the need for flexibility when it provided that the injunction would lift if the British Court's stay terminated. Esteve has not demonstrated that all of the creditors will not share in the distribution of the almond proceeds or that the Administrators will be unable to obtain a fair distribution for the Debtor's creditors. At oral argument on appeal, Esteve's attorney conceded that the injunction did not preclude Esteve or other California creditors from attempting to obtain a judgment in the United Kingdom, Belgium, France, or any country other than the United States. We are unwilling to upset the bankruptcy court's choice of remedies absent an abuse of discretion.

Finally, comity with the United Kingdom is appropriate under § 304 because the insolvency proceeding was filed in the United Kingdom and not in Belgium. Indeed, enjoining Esteve from litigating the breach of contract action in the State Court in no way upsets the Belgium Court's ruling. Thus, the bankruptcy court was not confronted with the situation of having to choose between the British Court and the Belgium Court.

Accordingly, the injunction against Esteve and other California creditors was properly imposed under § 304(b)(1).

## V. CONCLUSION

In sum, the bankruptcy court had subject-matter jurisdiction to enjoin actions against Debtor even though Debtor did not have any property in the United States.

In addition, the bankruptcy court did not abuse its discretion in granting the Administrators' request for injunctive relief under § 304(b)(1). All of the relevant § 304(c) factors support the bankruptcy court's decision to defer to the British insolvency proceeding and enjoin any activity directed against Debtor with respect to property involved in the British insolvency proceeding.

AFFIRMED.