**In re Katsumi IIDA, Debtor.**

**Katsumi Iida; Masaaki Iida, Appellants,**

**v.**

**Junichi Kitahara; Henry C. Fong; Hibari Hawaii, Inc.; Kalalani KVR, Inc.; Kahala Royal Corp., Appellees.**

BAP No. HI–07–1006–DKS.
Bankruptcy No. 06–00376.
Adversary No. 06–90059.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted July 20, 2007.

Filed Sept. 26, 2007.

---

Keith Kiuchi, Kiuchi & Nakamoto, Honolulu, HI, for Appellants.

Kenneth H. Brown, Pachulski, Stang, Ziehl, et al., San Francisco, CA, for Junichi Kitahara.

Leonard A. Budyonny, Bickerton Lee Dang & Sullivan, Honolulu, HI, for Henry C. Fong, Hibari Hawaii, Inc., Kalalani KVR, Inc., Kahala Royal Corp.

Before DUNN, KLEIN and SMITH, Bankruptcy Judges.

## OPINION

DUNN, Bankruptcy Judge.

The appeal before us arises in a case under chapter 15 of the Bankruptcy Code, in which a Japanese bankruptcy proceeding has been recognized as a foreign main proceeding.[1] At the heart of this appeal is the question of whether a foreign bankruptcy trustee must obtain an order from a

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgat- ed as of October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 ("BAPCPA").

federal or state court in the United States before exercising control over property in the United States owned by the foreign debtor, even though the trustee is not seeking judicial assistance. The bankruptcy court determined that nothing in either the Bankruptcy Code or state law requires a foreign bankruptcy trustee to obtain such an order. We AFFIRM.

## I. FACTS

### A. *The Japanese Bankruptcy Proceeding*

Appellants, Katsumi Iida and Masaaki Iida (collectively, the "Iidas"), and appellee, Junichi Kitahara ("Kitahara"), are citizens of Japan. Pursuant to an order dated August 6, 2004 (the "Petition Order"), Katsumi Iida (the "debtor") was declared bankrupt under Article 126 of the Bankruptcy Law of Japan (Law No. 71, 1922) (the "Japanese bankruptcy proceeding").[2] Kitahara was appointed trustee of the debtor's estate in the Japanese bankruptcy proceeding under Article 142 pursuant to

the Petition Order (the "Foreign Representative").

Neither the debtor nor any of his corporations within the United States have creditors in the United States.

### B. *Debtor's Assets in Hawaii*

As of the commencement of the Japanese bankruptcy proceeding, the debtor owned all of the stock of Kalalani KVR, Inc. ("Kalalani"), and Kahala Royal Corporation ("Kahala"). Kalalani, in turn, owned all of the stock of Hibari Hawaii, Inc. ("Hibari").[3] Kalalani, Kahala and Hibari are three Hawaiian corporations (collectively, the "Hawaii Corporations"). The Hawaii Corporations held several valuable property interests, including substantial ownership interests in two limited partnerships that owned and operated the Kahala Mandarin Oriental Resort and the Kona Village Resort, two luxury hotels in Hawaii.[4]

**2.** There are five different types of insolvency proceedings in Japan, established through four different acts. Stacey Steele, *Insolvency Law in Japan, in Insolvency Law in East Asia* 13, 16–17 (Roman Tomasic ed.2006); *see also* Shoichi Tagashira, *Intraterritorial Effects of Foreign Insolvency Proceedings: An Analysis of "Ancillary" Proceedings in the United States and Japan*, 29 Tex. Int'l L.J. 1, 5 (1994). The insolvency proceeding germane to our discussion is bankruptcy, a general liquidation proceeding which covers both corporate and personal insolvencies. Steele, at 16–17. Japanese bankruptcies have the same character as chapter 7 proceedings in the United States, save for some procedural differences. Tagashira, at 5.

Unlike the commencement of a bankruptcy proceeding in the United States, where the petition for bankruptcy relief is automatically granted upon the filing of a petition, the commencement of a bankruptcy proceeding in Japan is subject to formal adjudication by the bankruptcy court. Steele, at 22–23. A debtor or creditor petitioning for bankruptcy must show that there are grounds for bankruptcy by demonstrating that either: (1) the debtor is

unable to pay its debts pursuant to Article 126–1; or (2) in the case of an entity, such as a corporation, its liabilities exceed its assets pursuant to Article 127–1. Steele, at 38; Tagashira, at 25. *See also* Tasuku Matsuo, *U.S. and Japan Bankruptcy Law* 32 (1971). Once the required proof has been presented, the bankruptcy court will make a declaration of bankruptcy. Steele, at 23. According to the Petition Order, which we reviewed on the bankruptcy court's electronic docket (main case docket no. 2) and of which we take judicial notice, the debtor was declared bankrupt under Article 126, Section 1 of the Bankruptcy Law of Japan. *See, e.g., Atwood v. Chase Manhattan Mortgage Co. (In re Atwood)*, 293 B.R. 227, 233 n. 9 (9th Cir. BAP 2003).

**3.** Hibari formerly was known as Taku Hawaii, Inc.

**4.** Specifically, Kahala wholly owned Kahala Hotel Associates Limited Liability Partnership, which owned and operated the Kahala Mandarin Oriental Resort. Hibari held a 40% interest in Kona Village Associates Limited Partnership, which owned the Kona Village Resort.

### C. Corporate Management of the Hawaii Corporations

#### 1. The original corporate management

The Iidas were officers and directors of the Hawaii Corporations prior to the commencement of the Japanese bankruptcy proceeding. Specifically, as reflected in the relevant corporate reports, Masaaki Iida was president and a director of Hibari. The debtor was president and secretary, as well as a director, of Kahala.

The Hawaii Corporations had other officers and directors as well, including appellee, Henry Fong ("Fong"). Melvin Yanos and Fred Duerr were both directors and officers of Kalalani. Fong was treasurer and vice-president, Michiharu ("Mike") Nagumo was a director, vice-president and secretary, and Marshall Dimond was a director of Hibari. Fong was vice-president and treasurer and Michiharu Nagumo was both a director and vice-president of Kahala.

#### 2. Removal of the original directors and officers by the Foreign Representative

##### a. Recognition of the Foreign Representative as sole shareholder by an officer of Hawaii Corporations

Approximately five months after his appointment, the Foreign Representative took steps to exercise his authority as sole shareholder of the Hawaii Corporations as part of his efforts to liquidate and administer the estate assets in the Japanese bankruptcy proceeding. To facilitate his control of the Hawaii Corporations, the Foreign Representative presented evidence of his appointment as trustee to Fong.

Fong consulted with the Hawaii Corporations' legal counsel and with the debtor's personal legal counsel at the time, who both advised Fong to accept the Foreign Representative's authority once he determined that the Petition Order was valid. Fong requested and received a certified copy of the Petition Order, which he had translated. Fong then asked the debtor's personal legal counsel to confirm that the translation was correct and that the Japanese bankruptcy court had, in fact, entered the Petition Order. After ascertaining the validity of the Petition Order, Fong accepted the actions of the Foreign Representative as shareholder of the Hawaii Corporations.[5]

##### b. The Hawaii Corporations' articles of incorporation and by-laws

The Foreign Representative proceeded to restructure the management of the Hawaii Corporations. The articles of incorporation of the Hawaii Corporations permitted them to have one director and one officer if the subject corporation had only one shareholder.[6]

The by-laws of the Hawaii Corporations permitted the shareholders to remove any and all directors by a vote of a majority of the shares then entitled to vote. The by-laws also allowed the directors to remove and replace any officer at any time. Although the by-laws allowed the shareholders to remove and replace directors at an annual or special meeting, the bylaws further permitted the shareholders to remove and replace directors without holding such a meeting, so long as all the shareholders

---

5. The Foreign Representative asserts that the Iidas never commenced a quo warranto proceeding to challenge Fong's acceptance of the Foreign Representative as shareholder.

6. The provisions regarding the appointment and/or election, removal and replacement of directors and officers in the articles of incorporation and the by-laws for all the Hawaii Corporations are virtually identical.

consented in writing, and such written consent was filed with or made part of the minutes of the board of directors or the corporate records.

### c. *Execution of the written consents*

By written consent dated January 7, 2005 ("Kahala Shareholder Consent"), the Foreign Representative, as sole shareholder of Kahala, removed the debtor as director and appointed Fong as sole director.[7] The Kahala Shareholder Consent also authorized Fong to appoint himself as the sole officer, holding all officer positions. By written consent dated January 10, 2005 ("Kahala Director Consent"), Fong, as sole director of Kahala, removed Katsumi Iida as an officer and appointed himself as the sole officer.

By written consent dated March 18, 2005 ("Kalalani Shareholder Consent"), the Foreign Representative removed Masaaki Iida, Marshall Dimond, and Cindy Asada as directors of Kalalani, and appointed Fong as sole director. The Kalalani Shareholder Consent also authorized Fong to appoint himself as the sole officer. By written consent dated the same day ("Kalalani Director Consent"), Fong, as sole director of Kalalani, removed Fred Duerr and any other unnamed person who had either not been previously removed or had not resigned as officer. Fong also appointed himself as the sole officer of Kalalani.

By written consent dated March 18, 2005 ("Hibari Shareholder Consent"), Fong, on behalf of Kalalani, removed Masaaki Iida, Melvin Yanos, Cindy Asada, and Marshall Dimond as directors of Hibari, and appointed himself as the sole director of Hibari. On the same day, by written consent ("Hibari Director Consent"), Fong, as sole director, removed Masaaki Iida, Melvin Yanos, and Cindy Asada as officers and appointed himself as the sole officer of Hibari.

Consistent with the Hawaii Corporations' by-laws, each of the written consents executed by the Foreign Representative and Fong noted that the written consents would be included as part of the corporate records or minute book.

The Kalalani Shareholder Consent, the Kahala Shareholder Consent, and the Hibari Shareholder Consent (collectively, the "Shareholder Consents") cited to the specific provisions in the Hawaii Corporations' respective by-laws allowing for the appointment of as many directors as there are shareholders and for the appointment of one person to hold all officer positions if there is but one shareholder. The Kalalani Director Consent, the Kahala Director Consent, and the Hibari Director Consent (collectively, "Director Consents") echoed the Shareholder Consents, stating that Fong was sole director and that the Hawaii Corporations' by-laws allowed for the appointment of one person to serve in all officer positions.

The Shareholder Consents further expressly approved and ratified all actions taken by Fong on behalf of the Hawaii Corporations since the last annual meeting.

### D. *The September 2005 Japanese Bankruptcy Court Order*

Upon application by the Foreign Representative, the Japanese bankruptcy court entered its order on September 22, 2005 (the "September 2005 Order"), authorizing the Foreign Representative to sell the Kahala Mandarin Oriental Resort (the "Man-

---

**7.** According to the Kahala Shareholder Consent, Michiharu Nagumo resigned as director and officer on August 19, 2004.

darin Oriental Resort Sale").[8] The Japanese bankruptcy court further authorized the Foreign Representative to exercise all powers of decision with respect to the stock of all companies whose stock the debtor owned, in addition to exercising his authority to enter the sale agreement.

### E. *The Iidas' Complaint*

On April 11, 2006, nearly seven months after the Japanese bankruptcy court approved the Mandarin Oriental Resort Sale and more than a year after the Foreign Representative exercised shareholder rights to remove the Iidas as directors and officers of the Hawaii Corporations, the Iidas filed a complaint in Hawaii state court against the Foreign Representative and Fong, in his capacity as officer and director of the Hawaii Corporations (the "Complaint").[9] The Iidas sought a declaratory judgment (the "Declaratory Judgment Action") recognizing the debtor as the sole shareholder of Kahala and Kalalani, reinstating the Iidas as directors and officers, and requiring shareholders' meetings. The Iidas also sought an injunction enjoining the Foreign Representative from removing the Iidas as directors and officers and from distributing the proceeds from sales of assets of the Hawaii Corporations.[10]

### F. *The September 2006 Japanese Bankruptcy Court Order*

Following the filing of the Declaratory Judgment Action, on application of the Foreign Representative (the "Applica-

tion"), the Japanese bankruptcy court entered an order on September 26, 2006, authorizing the Foreign Representative to take any and all actions necessary to administer and liquidate the assets of the Hawaii Corporations (the "September 2006 Order"). In the Application, the Foreign Representative asserted that, in light of the Complaint, approval of his actions, past and present, including the removal and replacement of the directors and officers of the Hawaii Corporations, was necessary to facilitate liquidation and administration of estate assets. In the September 2006 Order, the Japanese bankruptcy court expressly authorized the Foreign Representative to: (1) exercise the shareholders' rights to remove and replace directors and officers; (2) distribute any proceeds from the liquidation of assets or any remaining assets without notifying the debtor or obtaining his consent; and (3) take such action as was necessary to ensure that the September 2006 Order was recognized and given full legal effect by the federal and state courts of the United States. By its terms, the September 2006 Order was effective retroactively as to all actions taken on August 6, 2004, the date the Japanese bankruptcy proceeding commenced, and thereafter until its termination.

### G. *The chapter 15 Proceeding*

1. *Commencement of the chapter 15 main case and removal of the Declaratory Judgment Action*

On June 13, 2006, to deal with the Declaratory Judgment Action, the Foreign

---

8. According to the application, the Mandarin Oriental Resort Sale was to close on November 30, 2005.

9. The Hawaii Corporations were named as nominal defendants in the Complaint only to effect reinstatement of the Iidas as officers and directors and to require shareholders' meetings.

10. On or about July 8, 2004, just weeks before the commencement of the Japanese bankruptcy proceeding, Kona Village Associates Limited Partnership sold the Kona Village Resort (the "Kona Village Resort Sale").

Representative filed a chapter 15 petition for recognition of the Japanese bankruptcy proceeding as a foreign main proceeding pursuant to §§ 1515 [11] and 1517 [12] and to commence an ancillary proceeding pursuant to § 1504.[13]

The debtor filed an opposition to the petition for recognition.[14] He conceded that the Foreign Representative's petition satisfied the requirements of § 1515 and that the Japanese bankruptcy proceeding was a foreign main proceeding under § 1517(b)(1). But the debtor relied on § 1506 to argue that recognition nevertheless should be denied because recognition would be manifestly contrary to the public policy of the United States.[15] Specifically, the debtor contended that the Foreign

Representative was required to obtain permission from the United States Bankruptcy Court under chapter 15 or its predecessor § 304 before acting in January and March 2005 to remove the Iidas as directors and officers of the Hawaii Corporations.

After notice and a hearing, the bankruptcy court entered an order on July 14, 2006, authorizing the Foreign Representative to commence an ancillary proceeding and to seek the relief provided in §§ 1519, 1520 and 1521 (the "Chapter 15 Recognition Order").[16] Soon thereafter, the Foreign Representative removed the Declaratory Judgment Action from the state court to the bankruptcy court. The debtor did not contest removal.

11. 11 U.S.C. § 1515(a) provides: "A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition."
11 U.S.C. § 1515(b) provides:
A petition for recognition shall be accompanied by—
(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

12. 11 U.S.C. § 1517 provides, in relevant part:
(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—
(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

13. 11 U.S.C. § 1504 provides: "A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515."

14. Neither party included a copy of the debtor's opposition to the chapter 15 petition. We reviewed the debtor's opposition on the bankruptcy court's electronic docket and take judicial notice thereof.

15. 11 U.S.C. § 1506 provides: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."

16. Neither party included a copy of the Chapter 15 Recognition Order in the record before us. We reviewed the Chapter 15 Recognition Order on the bankruptcy court's electronic docket and take judicial notice thereof.

2. *The chapter 15 adversary proceeding*

Once the Declaratory Judgment Action was removed to the bankruptcy court, the Foreign Representative made a motion to dismiss the Complaint (the "Motion to Dismiss") pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. Fed. R.Civ.P. 12(b), *incorporated by* Fed. R. Bankr.P. 7012(b).

The Foreign Representative alleged in the Motion to Dismiss that the Iidas filed the Complaint in an attempt to circumvent Japanese bankruptcy law and the orders of the Japanese bankruptcy court and to challenge the authority of and the actions taken by the Foreign Representative as shareholder of the Hawaii Corporations in his efforts to administer and liquidate the Japanese bankruptcy estate. The Foreign Representative argued that, as the actions challenged in the Complaint involved a determination of his authority as trustee to administer and liquidate the debtor's assets in the Japanese bankruptcy proceeding, comity required deference to Japanese bankruptcy law and to the September 2005 Order and the September 2006 Order of the Japanese bankruptcy court (collectively, the "September Orders").

The Iidas opposed the Motion to Dismiss. They asserted that the Foreign Representative had no authority within the United States to remove the Iidas as directors and officers of the Hawaii Corporations because he did not comply with federal bankruptcy and state laws that they contended required him to obtain an order from a court within the United States formally recognizing his status as trustee in the Japanese bankruptcy proceeding.

On November 17, 2006, the bankruptcy court held a hearing on the Motion to Dismiss, which the bankruptcy court elected to treat as a motion for summary judgment.

The bankruptcy court determined that the Foreign Representative had the authority to remove and replace the Iidas as directors and officers of the Hawaii Corporations without obtaining prior permission from a court in the United States. Specifically, the bankruptcy court found that the September Orders fully authorized the Foreign Representative to act as a shareholder in place of the debtor with respect to the Hawaii Corporations, including acting to remove and replace the Iidas as directors and officers of the Hawaii Corporations, in furtherance of his duty to administer and liquidate the debtor's assets, and that comity impelled it to respect those orders. The bankruptcy court also determined that the Foreign Representative had complied with Hawaii law and the by-laws of the Hawaii Corporations in exercising his rights as shareholder. The bankruptcy court further found that nothing in either the Bankruptcy Code or Hawaii state law required the Foreign Representative to obtain a federal or Hawaii state court order recognizing his authority to act in his capacity as trustee in the Japanese bankruptcy proceeding.

Based on the foregoing determinations, the bankruptcy court granted summary judgment in favor of the Foreign Representative and dismissed the Complaint with prejudice as to all defendants. The Iidas appealed.

## II. JURISDICTION

The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334, over this core proceeding under 28 U.S.C. § 157(b)(2)(P). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158.

## III. ISSUE

Whether the Foreign Representative must obtain permission from a court in the

United States before exercising shareholder rights to vote to remove and replace directors and officers of the Hawaii Corporations.

## IV. STANDARDS OF REVIEW

■ We review summary judgment orders de novo. *Tobin v. San Souci Ltd. P'ship (In re Tobin)*, 258 B.R. 199, 202 (9th Cir. BAP 2001). Viewing the evidence in the light most favorable to the non-moving party, we must determine "whether there are any genuine issues of material fact and whether the trial court correctly applied relevant substantive law." *Id.*

■ When reviewing an order granting summary judgment, we neither weigh the evidence nor determine the truth of the matter, but only determine whether there is a genuine material issue of fact remaining for trial. *Abdul–Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996). We may affirm an order granting summary judgment on any ground supported by the record. *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 610 (9th Cir.2003).

## V. DISCUSSION

In their attempt to overturn the ruling of the bankruptcy court, the Iidas contend that the Foreign Representative had no authority as trustee to act outside of Japan because: (1) both federal and Hawaii state law require him to obtain further order(s) from a court within the United States recognizing his authority; and (2) Hawaii law does not recognize the exercise of shareholder voting rights by a foreign bankruptcy trustee. The Iidas further argue that, even if the Foreign Representative had the requisite authority, issues of material fact exist as to whether he properly followed procedures under both Hawaii state law and the by-laws of the Hawaii Corporations in removing and replacing the Iidas as directors and officers.

As we explain below, nothing in either the Bankruptcy Code or Hawaii state law requires the Foreign Representative to obtain a further order from a court within the United States recognizing his authority as trustee before exercising ownership rights. Further, the Iidas do not demonstrate that genuine issues of material fact exist to reverse the bankruptcy court's summary judgment ruling.

### A. *Overview of ancillary proceedings*

As the Foreign Representative exercised the shareholder rights regarding the Hawaii Corporations while former § 304 was in effect, and obtained recognition after new chapter 15 became effective, a review of the evolution of United States law with respect to foreign insolvency proceedings is appropriate.

#### 1. *Comity*

At least since the Nineteenth Century, principles of "comity" or accommodation of foreign proceedings have provided the method by which foreign bankruptcies have been recognized in American jurisprudence. *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539, 3 S.Ct. 363, 27 L.Ed. 1020 (1883)(enforcing under "international comity" Canadian bankruptcy scheme of arrangement made under Canadian statute that would have been unconstitutional impairment of contract if enacted by United States Congress); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457–60 (2d Cir.1985); Joseph Story, *Commentaries on the Conflict of Laws* §§ 420–21 (1834).

Thus, it is long settled that when there is a case or controversy regarding a foreign bankruptcy or a representative of a

foreign bankruptcy that warrants the intervention of courts in the United States, comity provides a basic mode of analysis. *Cunard,* 773 F.2d at 456.

Correlatively, when activity by a foreign representative in the United States is not a subject of controversy, the courts historically have had no occasion to become involved, it being a basic premise of American constitutional law that courts decide only cases and controversies. Measures taken by a foreign representative in the United States that do not require invoking the machinery of the courts and that all counterparties accept as legitimate do not present a controversy and are presumptively valid. If, however, the foreign representative's authority or capacity is challenged, then there is a controversy that would be appropriate for judicial application of principles of comity.

2. *Former § 304*

a. *History and purpose of § 304*

Congress enacted former § 304 as part of the Bankruptcy Reform Act of 1978. *Victrix S.S. Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 714 (2d Cir.1987); *Cunard,* 773 F.2d at 454. It was an innovation. Prior to the enactment of § 304, United States bankruptcy law did not provide specific procedures by which a foreign bankruptcy trustee could obtain relief in the United States to facilitate the foreign bankruptcy proceeding. *See Goerg v. Parungao (In re Goerg),* 844 F.2d 1562, 1567 (11th Cir.1988)(noting that § 304 had no predecessor in the Bankruptcy Act of 1898); *In re Axona Int'l Credit & Commerce, Ltd.,* 88 B.R. 597, 605 (Bankr.S.D.N.Y.1988)(Under the Bankruptcy Act of 1898, a foreign representative lacked authority to institute a bankruptcy proceeding in the United States.). *See also* 2 Alan N. Resnick & Henry J. Sommer, Eds., *Collier on Bankruptcy*

¶ 304.01[2] (15th ed. rev.2007); Jay L. Westbrook, *Chapter 15 at Last,* 79 Am. Bankr.L.J. 713, 718 (2005)(§ 304 "for the first time codified United States notions of comity and cooperation with foreign courts in bankruptcy matters.").

As the number of international insolvencies increased, with extraterritorial effects within the United States, Congress enacted former § 304 in 1978 to provide for the first time a bankruptcy remedy, in addition to comity, for dealing with issues related to foreign insolvencies. *Goerg,* 844 F.2d at 1567 (quoting *Cunard,* 773 F.2d at 454); *Axona,* 88 B.R. at 604–05; *In re Gee,* 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985); 2 *Collier on Bankruptcy* ¶ 304.01[2]. *See also Cunard,* 773 F.2d at 454 (§ 304 "was intended to deal with the complex and increasingly important problems involving the legal effect the United States courts will give to foreign bankruptcy proceedings.").

The primary purpose of former § 304 was to aid foreign insolvency proceedings by providing a uniform federal mechanism through which a foreign representative could obtain judicial assistance in administering assets in the United States and prevent a scramble for such assets by local creditors. *Id.* at 454–55; *A.P. Esteve Sales, Inc. v. Manning (In re Manning),* 236 B.R. 14, 21 (9th Cir.BAP1999)(quoting 2 *Collier on Bankruptcy,* ¶ 304.03[1] (15th ed. rev.1998)); *Bank of New York v. Treco (In re Treco),* 240 F.3d 148, 156 (2d Cir. 2001); *Victrix,* 825 F.2d at 714; *Goerg,* 844 F.2d at 1568. To effectuate this purpose, § 304 afforded bankruptcy courts substantial flexibility to fashion appropriate remedies in handling ancillary proceedings. *Manning,* 236 B.R. at 21 (quoting *Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon),* 153 F.3d 991, 998 (9th Cir.1998)); *Goerg,* 844 F.2d at 1568; *Koreag, Controle et Revision S.A. v. Refco F/X*

*Assocs., Inc. (In re Koreag),* 961 F.2d 341, 348 (2nd Cir.1992)(citing *Axona,* 88 B.R. at 606). In other words, "§ 304 by its terms require[d] an exercise of judicial discretion." *Treco,* 240 F.3d at 155.

In providing bankruptcy courts with such flexibility, Congress aimed to uphold "[p]rinciples of international comity and respect for the judgments and laws of other nations[.]" *Cunard,* 773 F.2d at 455 (quoting H.R.Rep. No. 95–595, at 324–25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281); *Manning,* 236 B.R. at 21 ("Section 304 'expresse[d] Congressional recognition of an American policy favoring comity for foreign bankruptcy proceedings.' ")(quoting *Remington Rand Corporation–Delaware v. Business Systems, Inc.,* 830 F.2d 1260, 1271 (3rd Cir.1987)). *See also Simon,* 153 F.3d at 998 (citing § 304 as an example of the Code's approach to international insolvencies in giving "deference to the country where the primary insolvency proceeding is located . . . and [providing] flexible cooperation in administration of assets."); *Goerg,* 844 F.2d at 1567–68 ("Consistent with '[p]rinciples of international comity and respect for the judgments and laws of other nations,' Congress intended that the bankruptcy courts have 'maximum flexibility' in fashioning appropriate orders.")(quoting H.R.Rep. No. 95–595, at 325 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281).

It is important to note that a § 304 proceeding was limited in scope. Filing a petition under § 304 did not initiate a normal bankruptcy case. Rather, "a section 304 case [was] an ancillary case in which a United States bankruptcy court [was] authorized to apply its processes to give effect to orders entered in a foreign insolvency proceeding" in order to "help further the efficiency of foreign insolvency proceedings involving worldwide assets." *Goerg,* 844 F.2d at 1567–68.

Further, § 304 was not "the exclusive remedy" for a foreign representative who needed the assistance of a court. *Cunard,* 773 F.2d at 455–56. Section 304 was permissive, not mandatory. *Id.* at 455. A foreign representative still had options to use in non-bankruptcy courts or could commence a full-fledged bankruptcy proceeding "if the estate in the United States [was] substantial or complicated enough to require a full case for proper administration." *Id.* at 456 (citing 11 U.S.C. § 303(b)(4)).

b. *Application of former § 304*

Former § 304(b) listed three general categories of relief which the bankruptcy court was authorized to grant to a foreign representative seeking judicial assistance in the administration of a foreign proceeding. Generally, under § 304(b), the bankruptcy court could: (1) enjoin the commencement or continuation of any action against the property involved in the foreign proceeding or the debtor concerning such property, including the enforcement of a judgment or the creation or enforcement of a lien; (2) order turnover of such property to the foreign representative; or (3) order other appropriate relief. 11 U.S.C. § 304(b)(1)-(3).[17]

---

17. 11 U.S.C. § 304(b) provided:
Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
(1) enjoin the commencement or continuation of
(A) any action against—

(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or
(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding

In deciding whether to grant relief under § 304(b), the bankruptcy court considered several factors under § 304(c), including comity, "guided by what will best assure an economical and expeditious administration of such estate[.]" [18]

■ The proceeding before us, however, is governed by new chapter 15, which applies to cases filed in bankruptcy court beginning October 17, 2005, and which replaced § 304 as the statutory scheme for proceedings ancillary to foreign bankruptcies. *In re Artimm,* 335 B.R. 149, 157 (Bankr.C.D.Cal.2005); *see also* 8 *Collier on Bankruptcy* ¶ 1501.01. Although the case law developed under § 304 no longer directly controls chapter 15 cases, it continues to inform our determinations to some extent. Westbrook, *Chapter 15 at Last, supra,* at 720. *See, e.g., In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006)("Although chapter 15 replaced section 304 of the Bankruptcy Code, which previously governed cases ancillary to foreign proceedings, chapter 15 maintains—and in some respects enhances—the 'maximum flexibility,' that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations[.]")(internal citations omitted).

**B.** *Chapter 15*

■ Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross–Border Insolvency formulated by the United Nations Commission on International Trade law ("Model Law" and "UNCITRAL") in a process in which the United States was an active participant. *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 631–32 (Bankr.E.D.Cal. 2006); H.R.Rep. No. 109–31, at 105–07 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 169–71; Westbrook, *Chapter 15 at Last, supra* at 719–20; *see generally,* Samuel L. Bufford et al., *Int'l Insolvency* (Fed. Judicial Ctr.2001) at 55–68. The language of chapter 15 tracks the Model Law, with some modifications that are designed to conform the Model Law with existing United States law. *Tri–Cont'l Exch. Ltd.,* 349 B.R. at 632; H.R.Rep. No. 109–31, at 105–07 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 167; Westbrook, *Chapter 15 at Last, supra* at 720.

■ Chapter 15 is fundamentally procedural in nature and does not constitute a change in the basic approach of United States law, which, as we have explained, has long been one of honoring principles of comity. *Id.* at 725.

One significant modification that is pertinent to our present inquiry appears in § 1509 relating to the right of direct ac-

to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.

**18.** 11 U.S.C. § 304(c) provided:
In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity [11 U.S.C. § 101 et seq.]; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

cess to courts. While Model Law article 9 [19] merely requires that the foreign representative be "entitled to apply directly to a court," § 1509 erects a structure in which the foreign representative passes through the bankruptcy court for a recognition decision, the specified consequences of which are that the foreign representative gains the capacity to sue and be sued in United States courts and the authority to apply directly to a court in the United States for appropriate relief, and that all courts in the United States must grant comity or cooperation to the foreign representative. 11 U.S.C. § 1509.[20] Congress specifically intended that control of these questions be concentrated in the bankruptcy court.[21]

19. Model Law art. 9 provides: "A foreign representative is entitled to apply directly to a court in this State."

20. 11 U.S.C. § 1509 provides:

(a) A foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.
(b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—
(1) the foreign representative has the capacity to sue and be sued in a court in the United States;
(2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
(3) a court in the United States shall grant comity or cooperation to the foreign representative.
(c) A request for comity or cooperation by a foreign representative in a court in the United States other than the court which granted recognition shall be accompanied by a certified copy of an order granting recognition under section 1517.
(d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.
(e) Whether or not the court grants recognition, and subject to sections 306 and 1510, a foreign representative is subject to applicable nonbankruptcy law.
(f) Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor.

21. The House Report explains:

This section implements the purpose of article 9 of the Model Law, enabling a foreign representative to commence a case under this chapter by filing a petition directly with the court without preliminary formalities that may delay or prevent relief. It varies the language to fit United States procedural requirements and it imposes recognition of the foreign proceeding as a condition to further rights and duties of the foreign representative. If recognition is granted, the foreign representative will have full capacity under United States law (subsection (b)(1)), may request such relief in a state or Federal court other than the bankruptcy court (subsection (b)(2)), and shall be granted comity or cooperation by such nonbankruptcy court (subsection[s] (b)(3) and (c)). Subsections (b)(2), (b)(3), and (c) make it clear that chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings. The goal is to concentrate control of these questions in one court. That goal is important in a Federal system like that of the United States with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property. This section, therefore, completes for the United States the work of article 4 of the Model Law ("competent court") as well as article 9.
... [S]ome cases in state and Federal courts under current law have granted comity suspension or dismissal of cases involving foreign proceedings without requiring a section 304 petition or even referring to the requirements of that section. Even if the result is correct in a particular case, the procedure is undesirable, because there is room for abuse of comity. Parties would be free to avoid the requirements of this chapter and the expert scrutiny of the bankruptcy court by applying directly to a state

The primacy of the bankruptcy court's authority over whether ancillary assistance will be granted to a foreign representative is reenforced by authorization for the bankruptcy court to issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation in another court in the United States if recognition is denied. 11 U.S.C. § 1509(d).[22]

The sole specified exception to the requirement of prior recognition before obtaining comity or assistance from a court in the United States is that a foreign representative is permitted to sue in a court in the United States to collect or recover a claim that is property of the debtor. 11 U.S.C. § 1509(f).

■ It is significant that the § 1509 requirement of prior permission by way of recognition by a bankruptcy court deals only with acts by a foreign representative who needs the assistance of a court in the United States. Nothing in the statute requires prior judicial permission for acts that do not implicate matters of comity or cooperation by courts. Moreover, as noted, § 1509(f) expressly permits a foreign representative to sue to collect or recover a claim that is property of the debtor without obtaining prior permission from a bankruptcy court. It follows that chapter 15 does not constrain a foreign representative from acts that do not require judicial assistance.

■ In this instance, the Foreign Representative's actions in exercising shareholder rights to change the directors and officers of the Hawaii Corporations, in circumstances in which the corporations and the Iidas acquiesced without questioning the Foreign Representative's authority, did not impel a need for judicial assistance. Thus, even if chapter 15 had been in effect when the Foreign Representative removed and replaced the officers and directors of the Hawaii Corporations, there would have been no impediment imposed by chapter 15.

■ The need for judicial assistance did not arise until the Iidas filed the Declaratory Judgment Action in Hawaii state court. By then, chapter 15 was in effect. The Foreign Representative complied with § 1509 by obtaining recognition, after which he removed the Declaratory Judg-

---

or Federal court unfamiliar with the statutory requirements. Such an application could be made after denial of a petition under this chapter. This section concentrates the recognition and deference process in one United States court, ensures against abuse, and empowers a court that will be fully informed of the current status of all foreign proceedings involving the debtor.

. . .

Subsection (f) provides a limited exception to the prior recognition requirement so that collection of a claim which is property of the debtor, for example an account receivable, by a foreign representative may proceed without commencement of a case or recognition under this chapter. H.R.Rep. No. 109–31, at 110–11 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 173 (citations omitted).

**22.** *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, Case No. 07–12383, 2007 WL 2479483, slip op. at 13, 15 (Bankr.S.D.N.Y. August 30, 2007)(determining that the subject funds' "real seat and therefore their COMI [center of main interest] is the United States, the place where the Funds conduct the administration of their interests on a regular basis and is therefore ascertainable by third parties … and, more specifically, is located in this district where principal interests, assets and management are located" and "there is no (pertinent) non-transitory economic activity conducted locally in the Cayman Islands by the Funds; only those activities necessary to their offshore 'business.' ").

ment Action to the bankruptcy court, which rendered the decision now on appeal.

▮▮▮ There is no merit to the assertion by the Iidas that recognition would be, as provided in § 1506, "manifestly contrary to the public policy of the United States." This public policy exception is narrow and, by virtue of the qualifier "manifestly," is limited only to the most fundamental policies of the United States. H.R.Rep. No. 109–31 at 109 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 172.[23] The Iidas have not articulated a fundamental policy of the United States that is offended by recognizing the Japanese bankruptcy proceeding.

Now that the chapter 15 proceeding has commenced, the Foreign Representative is free to seek the modes of relief enumerated in chapter 15 in furtherance of his administration of the Japanese bankruptcy estate. Sections 1521(a) and (b) authorize a bankruptcy court, in its discretion, to entrust the administration and/or distribution of the debtor's assets located within the United States to a foreign trustee at his or her request, as long as the interests of creditors are sufficiently protected.[24]

11 U.S.C. § 1521(a)-(b); *Tri–Continental Exch.*, 349 B.R. at 637; *Artimm*, 335 B.R. at 160; 8 *Collier on Bankruptcy* ¶ 1521.03. In other words, the bankruptcy court, deciding to grant relief under §§ 1521(a) and (b), simply gives the foreign representative the green light to proceed with his or her duties as trustee, provided that United States creditors' interests are sufficiently protected. In this case, there are no United States creditors with interests to protect.

▮▮▮ As explained above, the Foreign Representative need not obtain any order from the bankruptcy court recognizing his authority as trustee to act on any rights, interests and titles of the Japanese bankruptcy estate. Nonetheless, the Foreign Representative may avail himself of the accessory provisions in § 1521 at any time.

C. *Hawaii State Law Does Not Require the Foreign Representative to Obtain a State Court Order Recognizing His Authority as Trustee*

1. *H.R.S. § 658C does not apply*[25]

▮▮▮ The Iidas argue that Hawaii state law requires the Foreign Representative

---

**23.** The House Report explained § 1506:

This provision [§ 1506] follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States.

**24.** Under § 1521(a), the court may, at the request of the foreign representative, entrust administration or realization of the debtor's assets located within the United States to such foreign representative where necessary to effectuate the purpose of chapter 15 and to protect the debtor's and creditors' interests. Under § 1521(b), the court may, at the request of the foreign representative, entrust distribution of the debtor's assets located within the United States to such foreign rep-

resentative, so long as the interests of creditors are sufficiently protected. Thus, both subsections of § 1521 require that the court consider the interests of creditors when making its determination. Notably, these statutes direct the court to consider the interests of *all* creditors, not just the interests of United States creditors. *SPhinX*, 351 B.R. at 112–13.

**25.** The Iidas attempt to argue a point of law for the first time on appeal. Specifically, the Iidas contend that H.R.S. § 658B, which governs foreign money claims, applies. Though a reviewing court may refuse to consider an issue if raised for the first time on appeal, *see Smyth v. City of Oakland (In re Ralbert Rallington Brooks–Hamilton)*, 329 B.R. 270, 279 (9th Cir. BAP 2005), a reviewing court may consider it if: (1) exceptional circumstances exist as to why the party failed to raise the issue in the trial court; (2) the new issue

to obtain formal recognition of his authority as trustee under the September Orders before proceeding to exercise his rights as shareholder of the Hawaii Corporations. In support of their proposition, they cite Hawaii's version of the Uniform Foreign Money–Judgments Recognition Act. Haw. Rev.Stat. § 658C–1, et seq. (2007)("H.R.S."). Although they conceded before the bankruptcy court in their opposition to the Motion to Dismiss that H.R.S. § 658C typically applies to foreign money judgments, the Iidas insist on appeal that H.R.S. § 658C applies to the September Orders by analogy.

H.R.S. § 658C governs the enforcement of foreign money judgments in Hawaii. *Roxas v. Marcos*, 89 Hawai'i 91, 969 P.2d 1209, 1261 n. 36 (1998). H.R.S. § 658C–2 defines a "foreign judgment", subject to exceptions not applicable here, to mean any judgment of a foreign state granting or denying a *recovery of a sum of money* (emphasis added). H.R.S. § 658C–4 provides that, as part of the process in gaining recognition and enforcement of a foreign money judgment in Hawaii, a person may file a copy of the foreign judgment with the clerk of an appropriate court, as long as that foreign judgment is conclusive, final and enforceable where rendered.

H.R.S. § 658C, by the plain meaning of its terms, is inapplicable here. *Roxas*, 969 P.2d at 1261 n. 36 (stating that H.R.S. § 658C, "by its own terms, ... relates *only* to 'judgment[s] of a foreign state granting or denying recovery of a sum of money[.]' ")(emphasis added). The September Orders did not grant or deny recovery of a sum of money.

2. *H.R.S. § 414–145(b) applies to a foreign trustee*

■ The bankruptcy court determined that, under H.R.S. § 414–145(b)(3), the Foreign Representative was authorized to vote as a shareholder of the Hawaii Corporations, even though his name did not match that of the shareholder reflected on the corporate records (i.e., the debtor), because he was the trustee in the bankruptcy of the shareholder, and the corporation had accepted proof of his status as trustee.[26] The Iidas contend, however, that the term "trustee in bankruptcy" under H.R.S. § 414–145(b)(3) does not include a foreign bankruptcy trustee, claiming that nothing under Hawaii state law

arises while the appeal is pending because of a change in law; or (3) it is purely one of law and the opposing party will not suffer prejudice from the party's failure to raise the issue before the trial court. *Franchise Tax Board v. Roberts (In re Roberts)*, 175 B.R. 339, 345 (9th Cir. BAP 1994). The Iidas do not assert that any of these circumstances apply. Thus, we decline to consider the issue.

As with H.R.S. § 658C, based on a plain reading of the statute, H.R.S. § 658B does not apply. The rulings at issue are not foreign money claims, but two Japanese bankruptcy court orders authorizing the Foreign Representative to take any action necessary to administer and liquidate the debtor's assets in his capacity as trustee. In addition, exercising shareholder rights is not the same as pursuing a claim for money damages or en-

forcing a judgment, as the assistance of a court or other tribunal typically is not required.

26. H.R.S. § 414–145 provides in relevant part:

(b) If the name signed on a vote, consent, waiver or proxy appointment does not correspond to the name of its shareholder, the corporation acting in good faith is nevertheless entitled to accept the vote, consent, waiver, or proxy appointment and to give it effect as the act of the shareholder if:

... (3) The name signed purports to be that of a receiver or trustee in bankruptcy of the shareholder and, if the corporation requests, evidence of his status acceptable to the corporation has been presented with respect to the vote, consent, waiver, or proxy appointment; ....

supports the bankruptcy court's interpretation.

The Iidas do not cite to any authority to substantiate their argument. As we explained earlier, there is no material distinction between the functions of a trustee in a Japanese bankruptcy proceeding and a trustee in an American chapter 7 bankruptcy proceeding. Like the trustee in a United States bankruptcy proceeding, the trustee in a Japanese bankruptcy proceeding is appointed to liquidate and distribute the debtor's assets, with all titles, rights and interests of the debtor legally and automatically passing to the trustee. Steele, at 41; Matsuo, at 45. The trustee's duties and rights, whether under the Bankruptcy Code or Japanese law, are functionally the same.[27] We have not located any authority, under federal or Hawaii state law, that says otherwise.

### D. *No Genuine Issues of Material Fact Exist*

For the first time on appeal, the Iidas contend that issues of material fact exist as to whether the Foreign Representative removed the correct directors and officers of the Hawaii Corporations and whether he could exercise his rights as shareholder prior to the removal and replacement of all of the directors and officers of the Hawaii Corporations.[28]

First, the Iidas assert that the Foreign Representative named the wrong directors and officers in the Kalalani and Hibari Shareholder and Director Consents (collectively, the "Kalalani and Hibari Consents"). At the time that the Foreign Representative authorized the removal and replacement of the directors and officers of Kalalani and Hibari, Melvin Yanos and Fred Duerr may have been directors and officers of Kalalani, and Michiharu Nagumo and Marshall Dimond may have been directors and officers of Hibari. However, the Kalalani Shareholder and Director Consents named Marshall Dimond and Cindy Asada as the directors and Fred Duerr as the officer to be removed. The Hibari Shareholder and Director Consents named Marshall Dimond, Melvin Yanos and Cindy Asada as the directors, and Melvin Yanos and Cindy Asada as the officers to be removed. As the Kalalani and Hibari Consents did not name some of the current directors and officers, the Iidas contend, these directors and officers were not effectively removed.[29]

Second, the Iidas argue that the Foreign Representative could not begin to act as

---

**27.** Further, Fong, as an agent of the Hawaii Corporations, accepted the evidence of status submitted by the Foreign Representative. The debtor's personal legal counsel at the time even advised Fong that the debtor no longer controlled the shares of the Hawaii Corporations under Japanese law. The Iidas do not assert that Fong, as an agent of the Hawaii Corporations, accepted proof of the Foreign Representative's status and authority in bad faith.

**28.** In their opposition to the Motion to Dismiss, the Iidas merely contended that the Foreign Representative failed to hold a shareholder meeting to remove Melvin Yanos and Fred Duerr.

**29.** The Iidas included a copy of the Domestic Profit Corporation Annual Report as of January 1, 2005 for Kahala in the record. The January 2005 Kahala Annual Report listed Marshall Dimond as sole officer and director. The January 2005 Kahala Annual Report was filed in the Hawaii Business Registration Division on January 24, 2006. The signature of Marshall Dimond, certifying his signature on the January 2005 Kahala Annual Report, was dated March 31, 2005. The Iidas also included a copy of a letter to the Hawaii Business Registration Division, dated May 10, 2005, informing it that John Thompson was a new director. Notably, both of these documents reflect dates several months *after* the Foreign Representative executed the Kahala Shareholder Consent.

shareholder until he removed the directors and officers in place at the time. Between the date when Fong accepted the authority of the Foreign Representative and the date when the removal and replacement of the directors and officers took place, according to the Iidas, the Foreign Representative had no authority to act as shareholder of the Hawaii Corporations. Thus, the Iidas contend, any acts taken by Fong, on behalf of the Foreign Representative in the interim, should be treated as void.

 As noted *supra* n. 25, a reviewing court may consider an issue raised for the first time on appeal if: (1) exceptional circumstances exist as to why the party failed to raise the issue in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) it is purely one of law and the opposing party will not suffer prejudice from the party's failure to raise the issue in the trial court. *Roberts*, 175 B.R. at 345. A reviewing court "may consent to consider a pure question of law when it does not affect or rely upon the factual record developed by the parties, or where the pertinent record has been fully developed." *Id.*

 None of these circumstances is present here. Nothing in the record or in the briefs indicates that there were exceptional circumstances preventing the Iidas from raising these issues before the bankruptcy court. Nor have any changes taken place in the law giving rise to these issues. Finally, these issues are factual. Nevertheless, in order to set forth as complete an analysis of the issues as possible, we consider the Iidas' contentions that the Foreign Representative could not act as a shareholder of the Hawaii Corporations

unless and until all officers and directors were properly removed and replaced.

It is important to remember that Fong accepted the authority of the Foreign Representative to exercise the debtor's rights as shareholder based, at least in part, on the advice he received from the debtor's personal legal counsel at the time that the Kalalani and Hibari Consents were executed. The debtor's own personal legal counsel had advised Fong to accept the Foreign Representative's authority once Fong determined that the Petition Order was valid and, at Fong's request, even had confirmed that the translation of the Petition Order was correct and that the Japanese bankruptcy court had in fact entered the Petition Order. The Iidas have never called into question Fong's acceptance of this proof nor the advice rendered by the debtor's own personal legal counsel.

 The record before us is not adequate to permit us to ascertain whether the Foreign Representative named all of the directors and officers who continued to serve at the time that the Kalalani and Hibari Consents were executed. If this issue had been raised before the bankruptcy court, we might have a more complete record to review. However, if any error occurred, it is immaterial. The Foreign Representative's failure to name any particular directors and officers for removal and replacement in the Kalalani and Hibari Consents may be corrected at any time, as long as he follows the procedures set forth in the Hawaii Corporations' by-laws.[30] The Iidas admitted at oral argument that any technical errors could be eliminated by amended Corporate Consents. Further, none of the individuals who purportedly retained their corporate

---

**30.** The Foreign Representative complied in detail with the procedures specified in the Hawaii Corporations' by-laws in removing the Iidas as directors and officers, without holding an annual or special meeting, by executing written consents and causing them to be filed in the Hawaii Corporations' records.

offices has joined in the Iidas' complaint and, significantly, as the appellees point out, it was not until *more than one year after* the Foreign Representative removed and replaced the Iidas as directors and officers of the Hawaii Corporations that the Iidas acted to contest his actions.

In addition, the Kalalani and Hibari Consents show that the Foreign Representative, acting as sole shareholder, fully intended to remove and replace all of the directors and officers of the Hawaii Corporations. The Kalalani and Hibari Consents explicitly state that Fong was to be the *sole* director and the *sole* officer of the Hawaii Corporations. Further, the Kalalani and Hibari Consents specifically cite to the provisions in the Hawaii Corporations' by-laws, allowing for the appointment of as many directors as there are shareholders and for the appointment of one person to hold all offices. The Hibari Consent even amended the Hibari By-Laws to provide that a single individual could serve as the sole director of Hibari. The Kalalani and Hibari Consents also state that the Hawaii Corporations' by-laws allowed for the appointment of a sole officer. Thus, in all of the Consents, the Foreign Representative's intent was clear. Fong was to serve as sole director and officer: there can be no other reasonable interpretation.

With respect to their second argument, the Iidas again fail to provide any legal authority, federal or state, in support. Nothing in either the Bankruptcy Code or Hawaii state law requires a succeeding sole shareholder of a corporation to remove the current directors and officers in place at the time of his succession before his actions may take effect. Once the Japanese bankruptcy court declared the debtor insolvent and named the Foreign Representative as trustee, the Foreign Representative acquired all rights, titles and interests in the assets of the debtor, including his rights as a shareholder of the Hawaii Corporations. As soon as those rights, titles and interests passed to the Foreign Representative, he had the authority, as trustee, to exercise, and otherwise act upon, those rights, titles and interests. The Shareholder Consents and Director Consents clearly reflect that the Foreign Representative removed the Iidas as directors and officers of the Hawaii Corporations.

Further, as the appellees point out, the Consents expressly approved and ratified, retroactively, all of the actions taken by Fong on behalf of the Foreign Representative.

In short, the Iidas have failed to show that any genuine issues of material fact exist necessitating reversal and remand of the bankruptcy court's summary judgment ruling.

## VI. CONCLUSION

The bankruptcy court correctly determined that nothing in the Bankruptcy Code or in Hawaii state law required the Foreign Representative to obtain any further order from a court within the United States recognizing his authority as trustee before he could proceed to exercise and act upon any rights, titles or interests of the Japanese bankruptcy estate, including his right as a shareholder of the Hawaii Corporations. There were no genuine issues of material fact, and the Foreign Representative was entitled to judgment as a matter of law. Hence, the bankruptcy court did not err in granting summary judgment, and we AFFIRM.